IN THE SUPREME COURT OF TENNESSEE

AT NASHVILLE

| | | |
|---|---|---|
| DAVID A. ALEXANDER and MACLIN P. DAVIS, JR., | ) | FOR PUBLICATION |
| | ) | |
| Plaintiffs-Appellees | ) | FILED: JUNE 22, 1998 |
| | ) | DAVIDSON COUNTY |
| v. | ) | |
| | ) | HON. ROBERT S. BRANDT, |
| JULIA ANN WHITE INMAN | ) | CHANCELLOR |
| | ) | |
| Defendant-Appellant | ) | NO. 01-S-01-9705-CH-00103 |

FILED

June 22, 1998

Cecil W. Crowson
Appellate Court Clerk

For Appellant:

HARLAN DODSON, III
ANNE C. MARTIN
Nashville, TN

For Appellees:

WARD DEWITT, JR.
Nashville, TN

OPINION

REVERSED                                          BIRCH, J.

We granted permission to appeal under Tenn. R. App. P. 11 to the appellant, Julia Ann White Inman, in order to determine the amount of attorneys' fees, if any, that the appellees, attorneys David A. Alexander[1] and Maclin P. Davis, Jr., are entitled to recover from Inman, their former client, pursuant to a written fee agreement.

Under the circumstances presented herein, we conclude that (1) the agreement is not a contingent fee arrangement; (2) the attorneys and Inman shared the same understanding of the agreement; and (3) the fee charged is reasonable. Consequently, we hold that the attorneys have satisfied their high fiduciary duty of good faith in the formation of the agreement. We conclude also that the attorneys did not violate the terms of the agreement. Accordingly, we hold that the agreement is enforceable, and the attorneys are entitled to recover the full amount requested. Finally, the attorneys are not entitled to prejudgment interest.

I

After releasing her first attorneys, Inman engaged Davis and Alexander on September 6, 1988, to represent her in a fiercely contested divorce action which had already been set for trial on October 5, 1988. During the September 6 meeting between Alexander and Inman, Alexander requested a $10,000 retainer but did not discuss any other billing arrangements. He also recommended associating Davis to assist with the representation, and Inman

---

[1]Mr. Alexander died after the first trial of this case.

2

agreed.[2]  Because the attorneys were engaged only one month before the trial date, they obtained a continuance, and the trial was reset for November 15, 1988.  Once the trial was reset, approximately eight weeks were available to prepare for trial.

The parties entered into the fee agreement in dispute on September 22, 1988.  Neither Alexander nor Davis explained the agreement to Inman, although she admitted at trial to having read the agreement before signing it.  The agreement provides:

> The amount of the final fee to be paid by Client for legal services of Attorneys and lawyers and clerks under their supervision shall be a reasonable amount taking into consideration the time and labor required, the novelty and difficulty of the questions involved, the skill required to perform the services properly, the amount involved and results obtained, and other relevant factors.  Said final fee shall not exceed 15% of the total sum (in money and property) awarded to Client after commencement of the trial of said action for divorce for alimony in solido, for five years of alimony in futuro, and distribution and division of property, or 10% of such total sum awarded to Client by settlement prior to the commencement of such trial, provided that said fee shall in no event be less than (a) $10,000; or (b) the total amount on a time basis for work of Attorneys and other attorneys and clerks under their supervision at their usual hourly charges for work.
>
> Said retainer feel [sic] shall be credited toward the total charges to Client.  If the charges for work exceed $10,000, Attorneys shall bill

---

[2]In addition, Alexander's partner, attorney Ernest W. Williams, contributed substantially to the representation. Williams is not a party to this suit.

Client for said excess charges
within a reasonable time.


In the days before the trial, the attorneys examined the files from Inman's previous attorneys, subpoenaed bank records, amended the pleadings, and assembled the necessary evidence. They also requested the court to re-open discovery and to order Inman's spouse to answer several interrogatories propounded by her previous attorneys.


Because Inman suspected that her spouse had not been honest about the existence and value of all marital assets, a great deal of time was devoted to identification and re-evaluation of the marital estate. The trial court declined to re-open discovery, so an extensive search of various documents and bank records became necessary. With Inman's assistance, they located at least one undisclosed asset and proved that the value of the marital estate was approximately $1,666,000 more than Inman's spouse had estimated. The attorneys testified that they toiled many evenings and weekends to prepare for trial and that they devoted considerable time to meeting or talking with Inman.


The trial was conducted on November 15, 16, and 17, 1988. In December 1988, the trial court found that the value of the marital estate was approximately $8,000,000 and entered an order awarding the divorce to Inman's spouse on the grounds of cruel and inhuman treatment. Additionally, the court awarded Inman $2,300,200 of the marital estate. In January 1989, Inman received partial payment of the judgment; with it she paid the attorneys

$149,000 in fees and approximately $16,000 in expenses. She did not ask for an explanation of how the fee was calculated or what services were included.

The attorneys continued to represent Inman on the appellate level. On October 18, 1989, the Court of Appeals reversed the trial court's judgment and held that Inman was entitled to: (1) the divorce, on grounds of adultery, (2) an additional $1,043,230 of the marital estate, (3) $5,000 in alimony per month, and (4) 50% of her attorneys' fees accruing at trial and 75% of her attorneys' fees accruing on appeal. The Court of Appeals also removed $850,000 from her spouse's separate property and added it to the marital estate, for a total marital estate of $8,850,000.

Inman's spouse then applied for permission to appeal to this Court, and we granted his application. On April 22, 1991, the Court reversed the Court of Appeal's award of alimony and attorneys' fees, affirmed the award of the divorce to Inman and the $1,043,230 increase of her share of the marital property, and remanded the cause to the trial court for further proceedings. On July 1, 1991, the Court denied Inman's petition to rehear.

On remand, the attorneys continued to represent Inman, at least at first. They requested the trial court to award interest and income from certain real estate, stocks, bonds, and other property that had been awarded to Inman yet remained in her spouse's possession. On August 16, 1991, the trial court dismissed the motion, and the attorneys advised Inman to appeal this ruling.

5

Meanwhile, Davis had written a letter to Inman on July 10, 1991, explaining that the attorneys' fee would be 15% of her $3,343,430 award, a total of $501,514.50. Because she had already paid $159,000,[3] the attorneys requested the balance of $342,514.50. Although Inman was distressed by the amount requested, she waited until late August 1991 to respond that she was unwilling to pay it. Consequently, the attorney-client relationship was severed, and Inman retained other counsel to represent her in all subsequent proceedings.

The attorneys sued Inman for the unpaid fee on December 13, 1991. Inman, alleging that the fee agreement was unenforceable and the fee was clearly excessive, counterclaimed for a portion of the $159,000 she had already paid. On March 3, 1993, following a three-day trial, the jury returned a verdict for the attorneys in the amount of $263,985, to be paid in addition to the $159,000 already paid.

Inman appealed the verdict, and on February 8, 1995, the Court of Appeals reversed and remanded for another trial. <u>Alexander v. Inman</u>, 903 S.W.2d 686 (Tenn. Ct. App. 1995). The Court of Appeals opinion provided comprehensive guidance to the trial court on evidentiary issues, jury instructions, and the law relating to contingent fees in domestic relations cases. On remand, the parties agreed to a bench trial on the record of the original trial.

---

[3]This figure consists of the original $10,000 retainer fee, plus the $149,000 paid after the divorce trial was concluded.

A bench trial ensued, and on January 29, 1996, the trial court ruled that the attorneys had violated the fee agreement by failing to bill Inman within a reasonable time and that $501,514.50 is an unreasonable fee under the circumstances presented. Upon analyzing the factors determining reasonableness, the trial court concluded that $300,000 is a reasonable fee and awarded the attorneys the unpaid portion of this amount--$141,000. The trial court also denied the attorneys' request for prejudgment interest. Inman appealed this ruling, and the cause came before the Court of Appeals for the second time.

The Court of Appeals held that the fee agreement is contingent and unenforceable. However, because the court found that the fee requested was not "clearly excessive," the attorneys were allowed to recover in *quantum meruit* for the reasonable value of their services. The Court of Appeals determined that the reasonable value of their services was $280,757.25. Since Inman had already paid $159,000, the attorneys were awarded $121,757.25 plus interest, to begin accruing February 13, 1996, the date of entry of the trial court's judgment on remand. Judge Koch dissented from the Court of Appeals decision, noting that the appropriate fee as determined by the majority, $280,757.25, was merely an average of the highest and lowest fees suggested by expert witnesses. Koch found the value of the attorney's services to be $166,252.50, which, after credit for the $159,000 already paid, would result in a judgment of $7,252.50.

Before this Court, Inman contends that the requested $501,514.50 fee is a clearly excessive contingent fee and, under

White v. McBride, 937 S.W.2d 796 (Tenn. 1996), the attorneys are not entitled to recover any fee at all.  Rather, she insists that she is entitled to recover the $159,000 already paid.  Alternatively, she urges that a reasonable fee in this case is $60,000 and that she is entitled to recover $99,000 from the attorneys.  The attorneys assert that the fee agreement is enforceable, that the fee requested is reasonable, and that they are entitled to an award of prejudgment interest.

In our view of the cause, we find the dispositive issues to be:  (1) whether the fee provided for in the agreement is a contingent fee; (2) whether the attorneys satisfied their fiduciary duty of good faith with respect to the formation of the fee agreement; (3) whether the attorneys violated the terms of the agreement; and (4) whether the attorneys are entitled to prejudgment interest.  Our review of all findings of law will be de novo, with no presumption of correctness.  Any findings of fact will be afforded a presumption of correctness, unless the preponderance of the evidence is otherwise.  Tenn. R. App. P. 13(d); Campbell v. Florida Steel Corp., 919 S.W.2d 26, 35 (Tenn. 1996).

II

As a general rule, contingent fee agreements are begrudgingly permitted in domestic relations cases. Because public policy favors marriage and discourages attorneys from promoting bitter divorce battles for financial gain, contingent fees are subjected to enhanced scrutiny and rarely are found to be

8

justified.  As a matter of fact, so unsavory are contingent fees in domestic relations cases that a higher quantum of proof is necessary to enforce a contingent fee.  <u>Alexander</u>, 903 S.W.2d at 698-99.[4]  Thus, our initial task is to determine whether the fee agreement before us describes a contingent fee.  The Court of Appeals found the fee to be one based upon a contingency.  Upon careful analysis, however, we find otherwise.

In <u>Eckell v. Wilson</u>, 597 A.2d 696 (Pa. Super. Ct. 1991), <u>appeal denied</u>, 607 A.2d 253 (Pa. 1992), a Pennsylvania court analyzed whether a fee based upon the "reasonable value" of attorney services, with a minimum fee calculated at an hourly rate, was contingent.  The court found that the fee was not truly contingent because the attorneys were guaranteed payment regardless of the outcome of the litigation.  In contrast, "[a] contingency fee agreement carries a risk that an attorney will not be paid if the outcome of the litigation is unsuccessful.  No such risk is found here."  <u>Id.</u> at 700-01.  Other courts have similarly defined "contingent fee":

---

[4]According to the Court of Appeals, the attorney whose fee in a divorce case is based on a contingency must demonstrate, in addition to the requirements for all attorney fee agreements:

>    (1) that the client is currently or will be unable to pay a reasonable fixed fee, or that the opposing party cannot pay reasonable *pendente lite* attorneys' fees or an award for attorneys' fees at the conclusion of the case;
>
>    (2) that the attorney has explained all relevant considerations to the client, including the availability of other fee or payment arrangements and the client's right to seek independent legal advice; and
>
>    (3) that the attorney has agreed to credit any court-awarded fees against his or her final fee.

See <u>Alexander</u>, 903 S.W.2d at 699.

9

> A contingent fee contract by definition is one that provides that a fee is to be paid to the attorney for his services <u>only</u> in case he wins, that is, <u>a fee which is made to depend upon the success or failure to enforce a supposed right</u>, and which fee is generally paid out of the recovery for the client.

<u>Pocius v. Halvorsen</u>, 195 N.E. 137, 139 (Ill. 1964) (emphasis added). "The usual meaning of 'contingent fee' is that the attorney will be paid <u>only</u> if the case is won." <u>V.W. v. J.B.</u>, 629 N.Y.S.2d 971, 973 (N.Y. Sup. Ct. 1995)(emphasis added).[5]

The fee agreement in the instant case closely parallels the agreement in <u>Eckell</u>, in that both use the term "reasonable" in describing the fee, and both state a minimum fee to be charged. In addition to these common elements, the agreement in the instant case states a maximum fee to be charged. This addition, however, does not alter our analysis, for under the terms of the agreement between Inman and the attorneys, there is no question that they would be paid regardless of the outcome of the case. Payment itself is certain; only the <u>exact</u> amount of payment is uncertain. The percentage of the total award merely marks the upward limit for the fee to be charged, and it is not the sole basis for the fee. Therefore, we find that this arrangement is not a contingent one, and any enhanced considerations applicable to contingent fees are

---

[5]<u>But see</u> <u>State ex rel. Oklahoma Bar Assn, v. Fagin</u>, 848 P.2d 11 (Okla. 1992) (because state rules prohibit any fee which has some aspect of a contingency involved, any enhancement of a fee based on a favorable result is contingent); <u>Salerno v. Salerno</u>, 575 A.2d 532, 533 (N.J. Super. Ct. Ch. Div. 1990) (an agreement for an hourly rate plus a bonus based on a percentage of the award is a contingent fee).

not relevant here.[6]  Rather, the criteria generally applicable to attorney fee agreements must be employed.

III

We move now to the second issue:  whether the attorneys satisfied their duty of good faith when they entered into the agreement in dispute.  The relationship of attorney and client is "extremely delicate and fiduciary"; therefore, attorneys must deal with their clients in utmost good faith.  This level of good faith is significantly higher than that required in other business transactions where the parties are dealing at arm's length.  Cooper & Keys v. Bell, 127 Tenn. 142, 150, 153 S.W. 844, 846 (1913); Alexander, 903 S.W.2d at 693.  The client must be able to trust the attorney to deal fairly at all times, including during the negotiation of the attorney's terms of employment.  Cummings v. Patterson, 59 Tenn. App. 536, 541, 442 S.W.2d 640, 643 (1968).

In this context, this Court has long held that an attorney is entitled to compensation in the amount agreed upon by contract, provided that the contract is fair at its inception and entered into in good faith.  Peoples Nat'l Bank of Washington v. King, 697 S.W.2d 344, 346 (Tenn. 1985).  In order to prove such good faith and fairness, an attorney seeking to enforce a contract for attorney's fees must show:

---

[6]In addition, because we find that the fee is not contingent, the recent case White v. McBride, 937 S.W.2d at 803, is inapplicable to this case.

11

> (1) the client fully understood the contract's meaning and effect,
>
> (2) the attorney and client shared the same understanding of the contract, and
>
> (3) the terms of the contract are just and reasonable.

Cooper & Keys, 153 S.W. at 846 (citing Planters' Bank of Tennessee v. Hornberger, 44 Tenn. 531, 573 (1867)).

We will analyze the first two criteria together. Our analysis begins with the inescapable and obvious conclusion that the attorneys, as authors of the agreement, understood it to allow them to charge up to fifteen percent of Inman's total award. The dispositive question, then, is whether Inman had the same understanding of the agreement's meaning and effect. In her testimony, Inman admitted that she read the agreement before signing it. She testified also that she was unable to recall whether she understood it at that time. Yet, the language of the agreement plainly stated that the fee could be as much as fifteen percent of the total award.

Additionally, the record reveals that Inman is an experienced realtor, well-acquainted with contracts of varying complexity and their interpretation. Indeed, from the record before us we easily conclude that she is a highly intelligent, self-reliant person who possesses acumen and tenacity in such measure as to enable her to succeed in the extraordinarily competitive field of real estate. As an example of her financial sophistication, Inman refused, on at least one occasion, to follow

her attorneys' advice that she accept cash equivalents in lieu of property. She was also actively involved in the management of her divorce case, helping the attorneys to uncover valuable assets belonging to the marital estate. Moreover, the record contains no suggestion of undue influence or fraud. Thus, we discern no plausible basis for concluding that Inman did not understand the words "Said final fee shall not exceed 15% of the total sum (in money and property) awarded to Client" when she read them.

Inman places a great deal of reliance upon the fact that the attorneys did not "walk her through" the fee agreement in detail and explain its terms and conditions to her. This omission, Inman argues, prevents the attorneys from demonstrating that she understood the agreement. However, this position is not well-taken. If we were to accept her argument, then nothing would be gained by reducing fee agreements to writing. This is true because a client could make a *prima facie* case of breach of fiduciary duty by simply denying that the attorney explained the agreement before the client signed it. See Maksym v. Loesch, 937 F.2d 1237, 1243 (7th Cir. 1991).

In Maksym, a client attempted to defend against her attorney's claim for fees by alleging fraud in the inducement. Because her claim of fraud was not supported by the proof, the client argued that all contracts between lawyers and clients are presumptively fraudulent if the lawyer benefits from the contract. Id. at 1241. While Inman has not resorted to the use of the term "fraud," her argument is strikingly similar. Because the attorneys did not explain the fee agreement to her, Inman claims that they

13

cannot prove she understood it, which under applicable case law would mean that the attorneys violated their fiduciary duty of good faith towards their client.  See Cooper & Keys, 127 Tenn. at 150-51, 153 S.W. at 846.

Yet, the failure of one party to explain the terms of a written contract to the other is not alone a violation of the fiduciary obligation of good faith, even if the contract is between attorney and client.  The argument that a fee agreement is unenforceable unless verbally explained to the client would effectively create a presumption that all attorney's fee contracts are unenforceable.  See Maksym, 937 F.2d at 1241-43.  We do not find such a presumption appropriate.

Certainly, an attorney should reach a clear agreement about fees with the client and should explain the reasons for preferring one arrangement over another. Ethical Consideration 2-19, Tenn. S. Ct. R. 8.  Nothing, however, suggests that a written retainer agreement cannot satisfy this ethical consideration.  In fact, reducing the agreement to writing is ideal.  Here, the attorneys amply demonstrated that Inman understood the agreement she signed and that the attorneys shared the same understanding; Inman adduced no evidence to suggest otherwise.  Therefore, we find that the attorneys have satisfied the first and second criteria of Cooper & Keys for showing good faith in dealings between attorney and client.

Under the third and last criterion for an attorney seeking to enforce a contract for fees, the terms of the contract

14

must be just and reasonable. Cooper & Keys, 127 Tenn. at 150, 153 S.W. at 846. On its face, the agreement between Inman and the attorneys requires a reasonable fee, based upon expressed factors. In general, an agreement which utilizes broad terms and does not fix an exact fee is still acceptable. This Court has allowed a law firm to enforce a promissory note created pursuant to a similarly worded fee agreement. See Waller, Lansden, Dortch, & Davis v. Haney, 851 S.W.2d 131, 132 (Tenn. 1992) (the retainer agreement provided that the firm be paid a reasonable fee based on the amount involved, the time expended, the novelty of the transaction, and the deadlines imposed upon counsel). Moreover, the agreement here is just and reasonable because it provides for a minimum and maximum fee to be charged. Indeed, the maximum fee provided a protection to Inman by defining the limit beyond which the fee could not rise.

Of course, the use of the word "reasonable" and the provision of a minimum and maximum fee will not alone make the agreement enforceable. We must also determine whether the fee ultimately charged was a reasonable fee, as is required by the terms of the agreement and by case law. We begin by noting that, as a practical matter, no court can divine from the range of reasonable fees the one that is "most reasonable." Indeed, those who have already opined a reasonable fee in this case have arrived at different figures. There is no need to second-guess the reasonable fees proposed because we hold that, under the circumstances, $501,514.50 is within the range of reasonableness. We reach this conclusion upon a careful analysis of the factors determining the reasonableness of an attorney's fee.

Pursuant to the fee agreement, the factors to be considered in determining the reasonableness of a fee are "the time and labor required, the novelty and difficulty of the questions involved, the skill required to perform the services properly, the amount involved and results obtained, and other relevant factors." These factors essentially mirror those enumerated by this Court in Connors v. Connors, 594 S.W.2d 672, 676 (Tenn. 1980). Additional factors relevant to reasonableness of a fee include: the time limitations imposed by the circumstances, the fee customarily charged in the locality for similar legal services, and the experience, reputation, and ability of the lawyer performing the legal service. Id.

In our consideration of what is a "reasonable fee," we have relied on the trial court's findings of fact. First, with respect to time and labor devoted to Inman's representation, we agree with the trial court that considerable amounts of each were expended. While divorce cases are more often disposed of without a contested trial, Inman's case required a three-day trial, an appeal to the intermediate court, and an appeal to this Court. The appeal to the intermediate court was based on factual issues, and the preparation of a brief in such a case is a time-consuming task, in that bits and pieces of evidence adduced during the three-day trial had to be organized and restated understandably and persuasively. In sum, this was no ordinary divorce case in terms of the time required of the attorneys.[7]

_____

[7]With respect to time and labor, we disregard the attempted reconstruction of the attorneys' time records and the allegations of over-staffing and duplicative services. There is no need to reconstruct the exact hours spent on the case, because the fee was

16

As an added consideration, the fact that Inman retained the attorneys a scant month before the initial trial court date imposed a severe burden on them. They were able to obtain a continuance to November 15, 1988, but even so, they had precious little time--two months--to prepare for trial. Because the attorneys came into the case so late, they had to prepare more intensely than they would have, had they been representing her from the beginning.

We move now to a consideration of the novelty and difficulty of the questions involved and the skill required to render effective representation. According to the trial court, there was nothing novel or difficult about the issues raised in this divorce case. The trial court further explained that divorce cases are not particularly difficult compared to other types of cases, because they usually involve factual situations with which the trier of fact is familiar. Yet, the time constraints, the number of issues, and the value of the marital estate significantly increased the difficulty of this case. Based upon a consideration of those factors, it is clear to us that only those attorneys with extraordinary skill and specialized experience would have been able to properly represent Inman and manage her case.

---

not controlled by the attorneys' hourly rates. Rather, the parties clearly intended some leeway beyond the hourly rates. The time devoted to the case is but one of several factors determining the overall reasonableness of the fee charged. Because it is clear that the attorneys put innumerable hours into Inman's case, the time and labor factor suggests that the $501,514.50 fee is reasonable. Of course, as this case illustrates, it is preferable for an attorney to maintain reliable time records, regardless of the kind of fee arrangement the attorney has with the client.

Furthermore, considering the criteria of experience, reputation, and ability of the attorneys, we do not hesitate to conclude that these attorneys were exceptionally well-qualified to handle such a difficult case. The quality of their representation is evidenced by their unflagging persistence and consummate skill. Expert witnesses testified that each of Inman's attorneys possessed an extraordinary degree of expertise and enjoyed an excellent reputation in the area of domestic relations. The trial judge, on remand, agreed that Inman's attorneys were "veteran trial lawyers with reputations for tenacity and competence." Furthermore, there is an abundance of proof in the record that the attorneys represented Inman to the best of their skills and abilities. This was what she expected of them, and, indeed, this is what she received.

With respect to the results obtained by the attorneys, the trial court concluded that the results were not particularly good. On this point, we differ. Admittedly, Inman's objection to the fee charged stems from a dissatisfaction with the results. She insists that the results obtained were not favorable because she was awarded much less than fifty percent of the marital estate, the amount to which she considered herself entitled. Yet, the attorneys managed to convince the Court of Appeals to reverse the trial court ruling which awarded the divorce to her spouse--no small feat. Even more important, the Court of Appeals substantially increased the amount awarded to Inman by the trial court. In addition to having been advanced to the position of the prevailing party in this bitter divorce action, Inman was also awarded an additional $1,043,230 of the marital estate, increasing

her total award to $3,343,430--approximately thirty-eight percent of the marital estate. This increase is particularly impressive in light of the fact that she was not shown by the evidence to be the primary wage-earner.[8] See Inman v. Inman, 811 S.W.2d 870, 870-71 (Tenn. 1991). Moreover, the dollar amount of marital assets is also a significant factor in the fee-determination process. Because the essence of the dispute concerned the distribution of an almost nine million dollar estate, Inman's attorneys are entitled to a proportionally larger fee.

There is countervailing proof regarding the reasonableness of the fee. Evidence of the smaller fee charged by the attorney for Inman's spouse and the expert testimony of one witness, taken together, permit the inference that for similar services other attorneys have charged or may charge less. That inference notwithstanding, just as no two cases are the same, no two lawyers are the same, and unless the legal profession decides to operate under a "uniform fee" system, no two fees will be the same. Thus, the fact that other lawyers may have performed similar services for less does not undermine the reasonableness of the fee charged by Inman's attorneys.

While no single factor determines reasonableness, on balance we conclude that the fee of $501,514.50 is reasonable. In sum, because the fee agreement provided both a minimum fee and a

_____

[8]In the instant case, Inman's own expert, Rose Palermo, a lawyer who handles divorce cases involving large estates, testified that in such cases the spouse who was not the primary wage-earner typically receives approximately thirty-five to forty percent of the marital estate.

protective cap on the fee, and because the fee ultimately charged was based on the reasonable value of services rendered, the attorneys have satisfied the third criterion of Cooper & Keys, that the terms of the agreement be just and reasonable. The fee agreement thus conforms to case law and the code of professional responsibility. To conclude, with all three Cooper & Keys criteria satisfied, the attorneys have shown that they fulfilled their high fiduciary duty of good faith toward Inman in the formation of the fee agreement between them.

IV

We need not dwell at length on the third issue: whether the attorneys violated the terms of the fee agreement. The attorneys waited until the entry of the final judgment of this Court, in July 1991, to send Inman the bill. According to the trial court, this delay violated the fee agreement, which required "If the charges for the work exceed $10,000, Attorneys shall bill Client for said excess charges within a reasonable time."

Clearly, this agreement does not require periodic or interim billing, which is the customary method when the fee is calculated solely on a per-hour basis. Further, Inman never inquired about the lack of billing during the three years the appellees represented her. Even when the attorneys requested a payment of $149,000 in attorneys' fees after the trial, she did not request an accounting or explanation of the fees. Because neither the language of the agreement nor the conduct of the parties indicated a need for interim billing, we conclude that no such

20

requirement existed. The fee was ultimately based upon Inman's total award. This amount could not be ascertained before final judgment. Because the bill was sent promptly upon entry of the final judgment of this Court, we conclude that such billing was accomplished within a reasonable time. Thus, the attorneys fulfilled their obligations under the agreement.

V

The final issue is whether the attorneys are entitled to prejudgment interest. The attorneys insist that interest should begin accruing on the date they first requested payment of their fees, July 10, 1991. The trial court declined to award prejudgment interest in this case, reasoning that

> Alexander and Davis seem to have been the major cause for their failure to be timely paid. Their contract is vague and, most importantly, they did not follow it themselves, particularly the part that required them to bill Inman within a reasonable time.

The Court of Appeals did not disturb this ruling, but allowed interest to begin accruing from the date the judgment of the trial court was entered on remand, February 13, 1996.

Pursuant to Tenn. Code Ann. § 47-14-123, prejudgment interest may be awarded in accordance with the principles of equity.[9] In reaching an equitable decision, a court must keep in

_____

[9]Tennessee Code Annotated § 47-14-123 (1988) provides:

21

mind that the purpose of prejudgment interest is to fully compensate a plaintiff for the loss of the use of funds, not to penalize a defendant. Moreover, if a plaintiff's right to recovery and the amount of such recovery are not disputed on reasonable grounds, an award of prejudgment interest is more likely to be equitable. <u>Myint v. Allstate Insurance Co.</u>, ___ S.W.2d ____ (Tenn. 1998), 1998 W.L. 276184.

The trial court's decision to award or deny prejudgment interest may be overturned only upon a finding of a "manifest and palpable abuse of discretion." Under this deferential standard, an appellate court may not substitute its judgment for that of the trial court. Rather, an abuse of discretion occurs only when the evidence does not support the trial court's decision. <u>Id.</u>

We have concluded, contrary to the trial court's ruling, that Inman's refusal to pay the attorneys' fees is not attributable to the attorneys' conduct. Nevertheless, the trial court's denial of prejudgment interest is not a manifest and palpable abuse of discretion. We reach this conclusion because an additional factor supports the trial court's decision: both the right to recover the fees and the amount of such fees were quite reasonably disputed. This fact is amply demonstrated by the sound, yet widely differing, conclusions reached by the several jurists who have analyzed this

---

Pre-judgment interest, i.e., interest as an element of, or in the nature of, damages, as permitted by the statutory and common laws of the state as of April 1, 1979, may be awarded by courts or juries in accordance with the principles of equity at any rate not in excess of a maximum effective rate of ten percent (10%) per annum; . . . .

case.  In light of the extreme uncertainty of the final disposition of this case, we conclude that an award of prejudgment interest would not serve to compensate the attorneys for loss of the use of funds.  Rather, such an award would amount to a windfall. Accordingly, the attorneys' request for prejudgment interest is denied.

VI

In conclusion, we recognize that the agreement at issue could have been more clearly drafted.  Although language of the agreement is not ambiguous, a more carefully crafted document may have spared the parties protracted litigation.  Yet, under the facts and circumstances presented, we find that Inman nevertheless fully understood the agreement and had the same understanding as the appellees.  Further, the agreement was fair and reasonable, as was the fee ultimately charged.  Inman does not allege fraud or undue influence in the formation of the fee agreement, and there is no evidence of such bad faith conduct.  Therefore, the attorneys satisfied their high fiduciary duty of good faith towards Inman in the formation of the fee agreement.  Further, the attorneys did not violate the terms of the agreement by postponing the billing until the case was concluded.  Finally, the attorneys are not entitled to an award of prejudgment interest.

Accordingly, the judgment of the Court of Appeals is reversed.  The fee agreement is enforceable, and the appellees are entitled to the full amount requested, $501,514.50.  Because Inman has already paid $159,000 in attorneys' fees, judgment for the

23

appellees is hereby entered in the amount of $342,514.50, with interest accruing on and after February 13, 1996, pursuant to the opinion of the Court of Appeals. Costs of the appeal are taxed to the appellant, for which execution may issue if necessary.

_____
ADOLPHO A. BIRCH, JR., Justice

CONCUR:

Anderson, C.J.
Drowota, Holder, JJ.
Reid, S.J.