**IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE**

**FILED**

**March 16, 2000**

**Cecil Crowson, Jr.
Appellate Court Clerk**

FRANKIE PAULINE MAPLES,  )  E1999-00550-COA-R3-CV
           )
  Plaintiff/Appellant   )  Appeal As Of Right From The
           )  KNOX COUNTY FOURTH CIRCUIT
v.           )
           )
FRANK ALLEN MAPLES,   )  HON. BILL SWANN
           )  JUDGE
  Defendant/Appellee   )

**For the Appellant:**
Mike A. Hickman
Reed & Hickman
250 E. Broadway
Maryville, TN 37804

**For The Appellee:**
Frank L. Flynn, Jr.
Pryor, Flynn, Priest & Harber
P. O. Box 870
Knoxville, TN 37901

REVERSED & REMANDED           Swiney, J.

# O P I N I O N

   This is an appeal by Frankie Pauline Maples ("Wife") of the Trial Court's judgment reducing her alimony in futuro from $1,682 monthly to $718 monthly because Frank Allen Maples' ("Husband") income decreased substantially. Because Husband's recent decrease in income was foreseeable at the time of the original divorce decree, we reverse the judgment of the Trial Court,

1

dismiss Husband's Petition, and thereby reinstate the former award of $1,682 monthly alimony in futuro to Wife.

## BACKGROUND

These parties had been married for 37 years when Wife was granted a divorce in 1991 on the grounds of cruel and inhuman treatment and adultery. The original divorce decree provided that Wife would receive $2,200 per month as alimony in futuro for eight months, during which period of time she was to apply for social security disability benefits. Eight months after the entry of the divorce decree, the Trial Court reduced her alimony in futuro from $2,200 per month to $1,682 per month because she had been awarded $518 monthly in social security permanent disability payments as anticipated in the original divorce decree.

In August 1998, Husband filed a "Petition for Termination or Modification of Alimony" in which he alleged that "a material and substantial change in circumstances will occur in December 1998 . . . ." He further alleged that he is now 65 years of age and retired, that he is now receiving social security old age benefits, and that he believes his former Wife is receiving such benefits and that Wife's benefits "are substantial and adequate for the support of [former Wife]."

In response, Wife filed a "Motion to Increase Alimony and Spousal Support." She alleged that the cost of food, clothing and utilities has increased over time, that she believes Husband's income has increased substantially over the last seven years, and that the change in circumstances that Husband encountered was foreseeable, known to him at the time of the divorce and specifically set out in the divorce agreement, and therefore, alimony should not be reduced.

The circumstances which Husband alleged as "material changes in circumstances sufficient to cause a reduction or termination of his alimony obligation" are (1) his retirement; (2)

2

his receipt of the last of a long series of monthly payments from the purchaser of Eat-A-Snax, Inc., pursuant to a non-competition agreement and a consulting agreement; and (3) the beginning of social security old age benefits to both parties upon Husband's attainment of age 65.

In 1991, when the parties' original divorce was granted, the Trial Court found, as pertinent:

> With regard to the characterization of the status of the non-competition agreement in the sale of Eat A Snacks to Mr. Seivers, and the consulting agreement, counsel have argued long and hard and brought their respective experts to advance their respective positions. The Court holds that these two items are not property subject to equitable distribution. However, they are certainly relevant in setting spousal support.
>
> The Court would note with regard to the non-competition agreement: It throws off some $2,400 a month for the husband for a balance of ten years. The business was sold 12-31-88, so there are some years to run.
>
> With regard to the consulting agreement, it yields some $4,800.00 a month plus $1,300.00 a month for a total of $6,100.00 a month. That and the non-competition agreement yield some $8,500.00 a month income to the husband. It is his income stream, and accordingly relevant in a setting of spousal support, and in consideration of the parties' relative positions with regard to equitable distribution. These two items are not, the Court concludes as a matter of law, assets divisible at trial in the character of property.
>
> *   *   *
>
> With regards to spousal support, there are eleven factors. Some of them are the same ones as under equitable distribution. Among those eleven factors, the Court would want to emphasize factors one, three, four, nine and ten among the eleven, although the Court has considered all eleven. Factors five and six don't apply. Factor eleven is tax consequences.
>
> Factor one, the relative earning capacity, obligations, needs, and resources of each party including pension, profit-sharing, and retirement, the Court would note that the parties are going to divide

3

their IRAs. They have no pension plans, at least there was no proof as to same.

With regard to needs, as indicated above, there are credibility problems. The Court specifically finds that the wife's affidavit for expenses is inaccurate, inflated, and in places speculative. As noted this is a long marriage . . . . The husband is in better health.

* * *

This is a case for permanent spousal support. The wife is disabled as noted. The wife has not pursued what would appear to be an entitlement to disability income. The Court will set the alimony support at $2,200. per month less whatever the incremental cost for health insurance to be dealt with below, and that for a period of eight months, or until such earlier time as the wife has diligently pursued her Social Security Disability claim yet to be filed, and either succeeded or failed.

After the eight months, permanent alimony will continue. This is a permanent alimony case. Assuming the husband's economic state continues as we see it, essentially so, permanent alimony will continue, but it will be at a level appropriate after the conclusion of the Social Security case one way or another. We're going to have to have another hearing in eight months.

As stated, when Husband returned to the Circuit Court in 1998 with a petition to terminate or modify Wife's alimony, Husband argued that his retirement, the cessation of payments under the non-competition agreement and consulting agreement, and the initiation of social security old age benefits for both parties should result in a termination or modification of his alimony obligation. The Trial Court made a finding of fact that Wife had an income stream of zero on the day the divorce was granted and a gross income stream on the day of the hearing for modification of $2,406.94 [per month]. The Court found that Husband had an income stream on divorce day of $8,500 gross and $1,437.87 gross on the day of the hearing for modification. The Trial Court went on to find that Husband had since married well and his second wife had contributed substantially to

4

their marital estate and their income, while his former Wife had not remarried. The Court said:

> The case presents the painful comparison of a man who has moved on and married well and is comfortable today; of a woman who has not had an income stream save that which comes from the social safety net and her alimony. She has not remarried and does not - - is not able to look to the comfort of a spouse with a substantial income stream.

The Trial Court found that there is "no question whatsoever that the husband's income stream has drastically reduced. The wife's income stream has improved [from zero, exclusive of alimony, to $677.]" The Court then went on to discuss the issue of the foreseeability of the change:

> We come then to the point of foreseeability. As Mr. Flynn says, the foreseeability which is critical is the Court's intent: What did the Court foresee? Clearly both these parties foresaw that, when the husband's employment contracts expired - - and everybody knew in 1991, and this judge knew in 1991, that when the husband's employment contracts expired, in December of 1998 – that his vast and regal income stream would be gone.

> What did the Court say? The Court said, 'This is a permanent alimony case assuming the husband's economic state continues as we see it, essentially so, permanent alimony will continue.' . . . This judge did not foresee that either or both of these parties would live till December of 1998. This judge did not foresee, did not intend, that the husband's income stream would be deemed indefinite should the parties survive 12 - '98, such that the alimony would be permanent at the level of the $1,682.

The Trial Court then held that the onset of changed circumstances occurred on January 31, 1999, but that no change in alimony would occur until January of 2000. At that time, alimony would be reduced from $1,682 monthly to "the maximum allowable under the income stream, namely fifty percent . . . [or] $718 per month permanent alimony as of that date."

---

5

## DISCUSSION

Our review is *de novo* upon the record, accompanied by a presumption of the correctness of the findings of fact of the Trial Court, unless the preponderance of the evidence is otherwise. Rule 13(d), T.R.A.P.; *Davis v. Inman,* 974 S.W.2d 689, 692 (Tenn. 1998). A Trial Court's conclusions of law are subject to a *de novo* review with no presumption of correctness. *Ganzevoort v. Russell,* 949 S.W.2d 293 (Tenn. 1997).

Wife raises the following issues, which we quote:

1.   Whether the Trial Court improperly applied the law by reducing alimony in futuro for a change of circumstances that was both foreseeable and intentional by the Husband.

2.   Where Husband has the ability to pay the alimony awarded and the need of the Wife has not diminished, did the Trial Court improperly reduce the alimony in futuro of Wife?

3.   Whether the Trial Court erred in reducing Husband's alimony in futuro due to Husband's intentional dissipation of his assets and income stream?

4.   Whether Husband should be charged attorney's fees and costs for the appeal?

T.C.A. § 36-5-101 provides that the court may order spousal support and, " . . . on application of either party for spousal support, the court may decree an increase or decrease of such allowance only upon a showing of a substantial and material change of circumstances." T.C.A. § 35-5-101(a) (1996 & Supp. 1998). The party seeking relief on the grounds of a substantial and material change in circumstances has the burden of proving such changed circumstances warranting an increase or decrease in the amount of the alimony obligation. *Seal v. Seal,* 802 S.W.2d 617, 620 (Tenn. Ct. App. 1990). The change in circumstances must have occurred since the entry of the divorce decree ordering the payment of alimony. *Elliot v. Elliot,* 825 S.W.2d 87, 90 (Tenn. Ct. App.

6

1991). Furthermore, the change in circumstances relied upon must not have been foreseeable at the time the decree was entered. *Id.*

In this case, it is clear that when the divorce was granted, the parties knew the exact date on which Husband's monthly payments for his non-competition and consulting contracts would cease. Although the change in Husband's income is substantial, it cannot possibly be viewed as unforeseeable at the time of the divorce. To be a material change, it must have been unforeseeable at the time of the divorce. *Jones v. Jones,* 784 S.W.2d 349, 353 (Tenn. Ct. App. 1989). This Court has consistently held that unforeseeability is a criterion which must be satisfied in Tennessee in order for an award of alimony in futuro to be modified. *Sanella v. Sanella,* 993 S.W.2d 73, 76 (Tenn. Ct. App. 1999) ("In order to be material, a change in circumstances must have been unforeseeable at the time of the decree."); *Givler v. Givler,* 964 S.W.2d 902, 906 (Tenn. Ct. App. 1997) ("The change in circumstances must be shown to have occurred after the entry of the divorce decree, and must not have been foreseeable at the time the decree was entered into."); *McCarty v. McCarty,* 863 S.W.2d 716, 719 (Tenn. Ct. App. 1992) ("To be material, the change of circumstances must be shown to have been unforeseeable at the time the decree was entered."); *Elliot v. Elliot,* 825 S.W.2d 87, 90 (Tenn. Ct. App. 1991) ("The change in circumstances must be shown to have occurred after the entry of the divorce decree, and must not have been foreseeable at the time the decree was entered into."); *Seal v. Seal,* 802 S.W.2d 617, 620 (Tenn. Ct. App. 1990)("Changes in circumstances are not material if such changes were contemplated by the parties at the time they entered into the alimony and support agreement."); *Jones v. Jones,* 784 S.W.2d 349, 352-353 (Tenn. Ct. App. 1989) ("For the court to make any modification of alimony . . . there must be a showing of substantial and material change of relevant permanent circumstances since the divorce decree was granted. In addition

7

changes in circumstances are not material if such changes were in the contemplation of the parties at the time they entered into the alimony and support agreement.").

The change of circumstances relied upon by Husband and the Trial Court to modify the alimony is the cessation of payments under his non-compete and consulting agreements. The end of these payments can in no way be classified as having been unforeseeable at the time of the divorce decree. Not only was the end of these payments foreseeable, it was known to these parties and the Trial Court with certainty. Just as the original divorce decree made provisions for the foreseeable occurrence of Wife's obtaining Social Security disability benefits, the divorce decree could have made provisions for the known and foreseeable ending of Husband's income from the non-compete and consulting agreements. Since the change in circumstances in this case was undeniably within the contemplation of the parties at the time of the original divorce decree, we hold that the Trial Court erred in reducing the award of alimony to Wife from $1,682 per month to $718 per month based on that change.

Even if this Court were disposed to ignore the state of the law in Tennessee and modify this alimony award despite the foreseeability of the change in circumstances, that modification would not be proper considering the needs of Wife for support and the ability of Husband to pay that support. The decision to modify an alimony obligation is factually driven and requires a careful balancing of several factors. *Cranford v. Cranford,* 772 S.W.2d 48, 50 (Tenn. Ct. App. 1989). The factors set forth in T.C.A. § 36-5-101(d), applicable to the initial grant of spousal support and maintenance, where relevant, must be taken into consideration in determining whether there has been a change in circumstances to warrant a modification of the alimony obligation. *Threadgill v. Threadgill,* 740 S.W.2d 419, 422-423 (Tenn. Ct. App. 1987). While T.C.A. § 36-5-

8

101(d) enumerates several factors for the court to consider, the need of the spouse receiving the support is the single most important factor. *Cranford,* 772 S.W.2d at 50. In addition to the need of the spouse receiving support, courts most often take into consideration the ability of the obligor spouse to provide support. *Id.*

In this case, Wife's only income is derived from social security and alimony. The Trial Court made a finding of fact that Wife had a gross income stream of $2,406.94 on the day of the hearing for modification. Her claimed expenses were $2,792.53 per month. Husband had a gross income stream of $1,437.87 per month and claimed expenses of $5,086.19 on that date. That total, however, included a monthly tractor payment of $2,042. Husband testified he had only two more payments to make on the tractor as of January 1999. Discounting the tractor payment, Husband and Wife each claimed a need for approximately $3,000 per month to meet expenses and each claimed their only source of personal income to be social security benefits. The Trial Court found that Husband had "married well," however, and that his new wife provided income of $47,000 per year to help meet the family expenses, while Wife had not remarried and was not able to enjoy the comfortable standard of living that Husband had assumed. Notwithstanding this finding, the Trial Court reduced Wife's alimony payments from $1,682 to $718 per month.

This Court has previously held, in *Bowman v. Bowman,* 836 S.W.2d 563, 569 (Tenn. Ct. App. 1991), that even a substantial and material change of circumstances does not necessarily require a reduction of alimony, if the payor still has the ability to pay the support awarded and the need of the appellee has not diminished. In *Bowman* we found that, although Husband had a cancerous kidney removed and was no longer able to work, he continued to have the ability to pay support because the parties had "assets" which could be liquidated for Wife's support. We held:

9

While there was a change of circumstances, the change was not substantial or material insofar as the ability of the appellant to pay and the needs of the appellee. The record fully supports the trial court's finding that there were assets which could be liquidated and from which support could be paid.

We held, in that case, that the Husband's "ability to pay spousal support will not continue indefinitely. He is unable to work and, if he is forced to liquidate all of his assets in order to pay spousal support, he soon would have nothing from which to support himself." Based on that finding, we ordered that spousal support continue for one year, during which Wife would have time to sell marital property awarded to her in the divorce in order to support herself.

In this case, the Trial Court stated that it had applied our holding in *Bowman* when it ordered Wife's alimony to remain at $1,682 per month for one more year, then drop to $718. We find, however, that the economic situation of the parties in this case is sufficiently different from that of the parties in *Bowman* to require a different result. In *Bowman,* the property to be sold was the "homeplace," a 325 acre tract of land, which was to be sold and divided 2/3 to Wife and 1/3 to Husband. From the sale of that asset, Wife could secure an income for herself. In this case, the Trial Court held at the time of the divorce that Husband's primary asset - his interest in Frank's Eat-A-Snax, a snack vending company, worth $985,000 - was his separate property. At the hearing on his petition to terminate or modify alimony, he was asked to account for that asset:

Q:     When you sold Frank's Eat-A-Snax prior to the divorce, was $985,000 the sale price?

A:     Whatever is on the paper. I agree with what was on the paper, I signed it.

Q:     And . . . what is your testimony as to where all the $985,000 has gone?

A:     I've spent it and put it in bonds and stocks. I didn't put none in my pocket, if that's what you're referring to.

10

Q:    Now, you did tell me at depositions, I believe, that you had a house worth $350,000, is that right?

A:    Yes.

Q:    But you meant the land too?

A:    I meant what I've got up there, everything I've got up there is what I mean.

Q:    And you don't owe very much at all on that, do you?

A:    I owe $29,000 or $28,000.

                              *    *    *

Q:    Now, you talked about selling . . . Frank's Deli and Pudgey's at the same time, is that right?

A:    It's all one building

Q:    And I believe you sold that in March of 1996 . . . to a fellow from Chattanooga?

A:    Yes.

Q:    And I believe he gave you $234,000 or $235,000 for it, is that right?

A:    That's close.

Q:    And I believe you owed about $9,000 on the property, is that right?

A:    No, I owed maybe $40,000 . . . [I] paid off the thing. I want to think I got – my check was around $180,000 or $185,000.

Q:    What did you do with that money.

A:    Spent it. I didn't keep none of it.

Q:    What did you spend it on?

A:    I've done the best I could with either stocks and in the place up there. I've got a lot of money in the place. I've bought cattle and I've bought a tractor, fenced. I don't know how much fencing cost me.

11

Q:     You haven't kept very good records with what you've done with –

A:     I don't want to keep too good of records.

Husband further testified that he spent $24,000 he received from the sale of a camper and lot, and that he "might have invested a little of it in Las Vegas." He testified that in 1998, he wrote checks to cash for $17,400, which was cash he kept in his pocket all the time, and "bought maybe a cow, or cattle, or two, a head or two of cattle . . . paid $1,000 for a horse." In 1997, he wrote checks to cash for $7,050. He testified that he might have gambled just a little bit of it. He bought 40 or 45 cows and considers half of them to be pets; they will never be sold. The other half he will sell at a loss. He bought a $40,000 tractor, paying $6,000 cash. He has always wanted to be a hobby farmer. Perhaps more importantly, he testified the following:

Q:     So back during the divorce you knew that the day was coming when you were going to file this action and try to cut out your wife's alimony?

A:     I was hoping.
The evidence shows that Husband and his present wife have co-mingled their separate property and "by investing and reinvesting what [the Court] gave him at the time of the divorce" have accumulated a very substantial estate. He has no income from these assets because he and his current wife have invested in a $350,000 house and farm, tractor and farm animals which do not pay dividends, and other non-income producing assets. However, his Edward D. Jones investment portfolio, owned and invested solely by Husband and not with his current wife, shows an estimated portfolio value as of December 31, 1998 of $179,882.96. His income from that portfolio in 1998 was only $350.89. He testified that " . . . it's not generating income. It's . . . in a fund which accumulates over and over . . . as long as my wife works, I hope I don't have to start taking that out." He has another Edward D. Jones IRA account with an estimated portfolio value as of December 31,

12

1998 of $40,306.33, from funds which he was awarded in the divorce. This account also produces no income.

He testified:

Q: When did you first get the idea or notion that you were not going to have any more income and you were going to come to court and cut off your ex-wife's alimony?

A: When did I get the first - -

Q: When did the thought first cross your mind or the planning in your head that you were going to get your income to such a level where you couldn't afford to pay her alimony?

A: When it first come across my mind?

Q: Yes, sir.

A: The first payment I paid. I'm sorry to say that. The first payment I made.

From the record before us, Husband's goal from the time he made the first alimony payment has been to insure that he would have no income stream from which alimony could continue to be ordered paid to Wife. To achieve this goal, he spent the years since the date of the divorce either dissipating his significant income or placing it in investments or property that create no income stream, all with the stated objective of not having any "income" so he could have the alimony reduced or eliminated. While the record reflects much of Husband's income has been spent so as to increase his assets without producing any income, he also achieved his objective of making it virtually impossible to find where the rest of his substantial income went by following his stated procedure not ". . . to keep too good of records."

We find the evidence in this case proves that Husband has the ability to pay alimony despite the fact that he has chosen an investment strategy which dictates that he forego regular

13

income. That strategy appears linked to his desire to deprive Wife of alimony. Wife has a continuing need for the same amount of alimony that she was awarded in the divorce judgment. It appears that some of Husband's assets can easily be converted to income-producing, and that to do so would not necessarily result in any decrease in his estate. As the situation presently exists, his estate is growing daily because he is foregoing income, while Wife is unable to meet her daily needs. We find this situation unconscionable. We do not hold that Husband's current wife has any obligation or responsibility to fund these alimony payments. What we do hold is that Husband cannot place his substantial income over several years in valuable non-income producing assets and then claim poverty and an inability to pay alimony.

Finally, Wife asks that she be awarded her attorney fees and costs for this appeal. As reflected in this Opinion, Wife's income, even with no reduction of alimony, is not equal to her expenses. It is our opinion that Wife's request is reasonable and that ". . . she should not have to pay the costs of defending her entitlement to alimony. . . which, when combined with the support payments, still does not provide the standard of living to which she was accustomed during the parties' marriage." *McCarty v. McCarty*, 863 S.W. 2d 716, 722 (Tenn. Ct. App. 1992). This matter is remanded to the Trial Court to hear proof and set a reasonable attorney fee for Wife's attorney's services on appeal.

## CONCLUSION

For the reasons herein stated, we reverse the judgment of the Trial Court, dismiss Husband's Petition for Termination or Modification of Alimony, and remand for additional proceedings consistent with this Opinion, as necessary. Costs of this appeal are assessed against Husband, Frank Allen Maples.

14

_____
D. MICHAEL SWINEY, J.

**CONCUR:**

_____
HOUSTON M. GODDARD, P.J.

_____
HERSCHEL P. FRANKS, J.

15