# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE

**FILED**

**March 31, 2000**

**Cecil Crowson, Jr.**
**Appellate Court Clerk**

| DEBORAH ANN HOLLAND, | ) | NO. E1999-00586-COA-R3-CV |
|---|---|---|
| | ) | |
| Plaintiff/Appellant | ) | Appeal As Of Right From The |
| | ) | SEVIER COUNTY CIRCUIT COURT |
| v. | ) | |
| | ) | |
| JASON KEITH HOLLAND, | ) | HON. REX HENRY OGLE, |
| | ) | JUDGE |
| Defendant/Appellee | ) | |

**For the Appellant:**
Rebecca D. Slone
P. O. Box 1088
Dandridge, TN 37725

**For the Appellee:**
George R. Garrison
WEBB & GARRISON
1415 Middle Creek Road
Sevierville, TN 37862

VACATED and REMANDED

SWINEY, J.

## O P I N I O N

This is an appeal by Mother and Father of the Trial Court's award of custody of their two-year-old son to the child's paternal grandmother. The paternal grandmother was not a party to the divorce action in which the award of custody was made, and she had not petitioned for custody

of the child. For the reasons herein stated, we vacate the Judgment of the Trial Court and remand the case for further proceedings consistent with this Opinion.

## BACKGROUND

Deborah Ann Holland ("Mother") married Jason Keith Holland ("Father") on June 7, 1997. One child, Dylan Keith Holland, was born to this couple, on February 28, 1998. On September 18, 1998, Mother petitioned for divorce on the grounds of irreconcilable differences or, in the alternative, inappropriate marital conduct by Father which would entitle her to a divorce. In her Complaint, Mother asked the Trial Court that she "be designated the primary residential custodial parent of the parties' minor child, subject only to reasonable co-parenting times by the husband." Father filed his Answer on October 28, 1998, admitting that irreconcilable differences exist and denying inappropriate marital conduct. He filed a Motion on that same date seeking temporary custody of Dylan pending a final hearing. The matter was continued several times.

On February 12, 1999, the Trial Court appointed attorney Lisa F. Burgess as Guardian Ad Litem for Dylan and instructed her to "conduct an examination and make a report to this Honorable Court." On May 12, 1999, the Guardian Ad Litem filed a comprehensive report with the Trial Court. In that report, she stated that her investigation included the review of pleadings and depositions, meetings with both parents and observation of each parent with Dylan, home study at both residences, interview of the paternal grandmother, unsuccessful attempt to interview the maternal grandfather, interview of Mother's "boyfriend/fiancé" and his mother, and contact with general references provided by the parties.

The Guardian Ad Litem's interview with Father and Mrs. Finchum, the paternal grandmother, was conducted on April 21, 1999, with Dylan present. Father told the Guardian Ad

2

Litem that he and Mother had dated for four years through high school, had gotten married after graduation, and that Mother had become pregnant on the honeymoon or soon thereafter. When Dylan was born, Mother stayed at home to care for him while Father worked. When Father came home from work in the evening, Mother would hand Dylan to him and say, "Here . . . I can't take it anymore." He said Mother took Xanax and Valium for "nerves" and he believed she took the medications to excess at times. Dylan had medical problems (reflux) and had to be taken to the doctor often. When the parties separated, on August 25, 1998, Father and Dylan were visiting Mrs. Finchum at her home in Clark Range. Dylan had an ear infection with vomiting and diarrhea, and Father told Mother by phone that the child could not be returned to her until he had recovered enough to travel. Mother did not call to inquire about Dylan for five days. Father returned Dylan to Mother after nine days, when Dylan had recovered. Thereafter, Mother denied visitation to Father for several months because she thought he was trying to take Dylan away from her. Mother filed the Complaint for divorce on September 18, 1998.

Father and Mrs. Finchum told the Guardian Ad Litem that when Dylan was newborn, Mother often left the child with Mrs. Finchum for weeks at a time when he was sick or Mother was stressed. On one occasion, Mother checked Dylan in to a hospital, then left the next evening to get clothes and did not return until the next day. Father complained to the Guardian Ad Litem that Mother refused to allow him visitation with Dylan on Christmas Day until 6:00 p.m. and on the child's birthday.

Father told the Guardian Ad Litem that he has learned that Mother's father, Charles Ronald Gibson, has a child molestation conviction for which he was imprisoned. Father is concerned for Dylan's safety if he continues to be around the maternal grandfather. Mr. Gibson left

3

with the child on one occasion when Father was on his way to pick up Dylan, and Mr. Gibson has stated that "no Holland or Finchum" is allowed on his property. Father also complained that Mark Gibson, Mother's brother, has a criminal record and is a drug abuser. Father further claimed that Michelle Ogle, Mother's cousin, is a prostitute. Father is concerned for his son's safety around these maternal relatives. Mark Gibson lived with Mother and Father, sleeping on their living room floor, when they were first married. Father also expressed great concern to the Guardian Ad Litem that Dylan was being taught by Mother that her current boyfriend is Dylan's "DaDa."

On April 30, 1999, the Guardian Ad Litem interviewed Mother at her home. Mother told the Guardian Ad Litem that her marriage began breaking down during her pregnancy and that she believes Father had an affair or some kind of improper encounter with another woman during the seventh month of her pregnancy. Mother's father, Mr. Gibson, was not available, and Mother advised that he was a "stubborn man" and she could not require him to make himself available for interview. Mother acknowledged that Mr. Gibson was Dylan's primary caretaker during her work hours of 3:00 to 9:00 p.m. She thinks her father's criminal conviction and imprisonment was for "making a young boy perform oral sex on him," but she is not concerned for Dylan's safety around her father because she does not think he is "that kind of person" and thinks he might have been "set up" on the charge.

Mother told the Guardian Ad Litem that she is engaged to Robbie Reagan, whom she met at Cotton Eyed Joe in September 1998. She became pregnant by Reagan in November 1998 but miscarried. She and Reagan plan to marry as soon as her divorce from Father is final. Although Dylan calls Reagan "DaDa," she thinks he probably knows who his real father is. However, Reagan "supports Dylan" and considers him to be like a son.

4

The Guardian Ad Litem interviewed Robert "Robbie" Reagan and his mother. Reagan advised that he plans to marry Mother when her divorce is final. He spends time with Mother and Dylan but most of his visits are after Mother gets home from work and Dylan is asleep. Reagan's mother often babysits Dylan and calls to check on him almost daily.

Finally, the Guardian Ad Litem considered her investigation of the parents in light of the factors set forth in T.C.A. § 36-6-106. Based on all of the information she gathered, she recommended to the Trial Court that Father be granted primary physical custody of Dylan and that Mother be granted liberal visitation but "with no unsupervised visitation with Mr. Gibson absent further determination/evaluation."

On May 13, 1999, one day after the Guardian Ad Litiem filed her report with the Trial Court and provided copies to the parties, the final hearing in this matter was held. At that hearing, Father testified substantially as he had advised the Guardian Ad Litem. He denied having any extra-marital relationships before the parties separated but admitted a relationship during the separation. He testified that his mother, Mrs. Finchum, lives 1/4 mile from his home in Clark Range and would be available to help him care for Dylan if the Trial Court were to award him custody. He complained to the Court that he did not want Dylan in the presence of Mr. Gibson without supervision because of Mr. Gibson's criminal history.

Mother also testified substantially as she had advised the Guardian Ad Litem. She stated that her father, Mr. Gibson, is Dylan's primary caretaker when she is working. Her testimony was evasive on the issue of whether or not she knew that Mr. Gibson had been convicted of child molestation when she allowed him to care for Dylan, but she testified that she is not concerned that he might harm her son. She did admit that Mr. Gibson has made threats to Father and his family.

5

After Father and Mother were heard, the Guardian At Litem was called as the next witness. She began her testimony by describing the steps she undertook to investigate the parties. At that point, the following occurred:

COURT:  Ms. Burgess, let me ask you this. What is your impression of Ms. Finchum?

A:  I had a very favorable opinion of Ms. Finchum. She was also there. The child slept during half of the interview that I had. When he awoke, he seemed to have a good relationship with Ms. Finchum. She seems very intelligent and capable of expressing her love for the child.

MR. OGLE: I object to all of this, if your Honor please.

COURT:  Ms. Burgess, I'll tell you what. Would you step down? Ms. Finchum, is she here?

MR. GARRISON: Yes, she is.

COURT:  Step down here. I want to talk to you.

The witness, JUDY FINCHUM, having been first duly sworn, testified as follows:

COURT:

Q:  Take the witness stand. I want to ask you some questions. Ms. Finchum, what do you do during the daytime?

A:  We have our own business with floor covering. I help in the business when I'm needed. When I'm not at work, my time is basically whatever I want to do with it.

Q:  How old are you, if you don't mind me asking?

A:  I'll be 45 this year.

Q:  How many other children do you have?

A:  Two.

Q:  How old are they?

Q: A: James is 21. Judson's 19.

Q: What kind of living arrangements do you have in your home?

A: I have a two-bedroom room, living room, dining room, kitchen, garage, two bath rooms.

Q: Would you be willing to take this baby?

A: Would I be willing to take him?

Q: And be the custodian of the child?

A: Yes.

The Trial Court then asked counsel for the parties if they were "ready for the Court to rule?" Counsel for Father requested and was permitted a brief examination of the Guardian Ad Litem. The Trial Court then ruled that both parties in this divorce action had been guilty of misconduct and granted both a divorce, accompanied by a property settlement that is not on appeal. The Court then summarized the parental deficiencies it found in Father and Mother and held:

> Based upon that, based upon what the Court finds to be the overwhelming deficiencies of the parties, the Court is going to award the absolute care, custody, and control of this child to Ms. Finchum pursuant to T.C.A. § 36-6-101.

In this appeal, Mother raises the following issue:

> The Trial Court erred in awarding custody of the parties' minor child to the paternal grandmother when such relief was not requested in any pleading or by either party and when no finding of substantial harm to the child was made.

Father argues that the Court properly refused to grant custody to Mother because the evidence showed that the Mother posed a substantial risk of harm to Dylan, but that the Court erred in refusing to award custody to Father because the evidence did not show that he posed such a risk to the child.

7

**DISCUSSION**

Our review is *de novo* upon the record, accompanied by a presumption of the correctness of the findings of fact of the Trial Court, unless the preponderance of the evidence is otherwise. Rule 13(d), T.R.A.P.; *Davis v. Inman,* 974 S.W.2d 689, 692 (Tenn. 1998). A Trial Court's conclusions of law are subject to a *de novo* review with no presumption of correctness. *Ganzevoort v. Russell,* 949 S.W.2d 293 (Tenn. 1997).

The Trial Court based its award of custody to the paternal grandmother in this case on T.C.A. § 36-6-101. That statute provides, as pertinent:

> **36-6-101. Decree for custody and support of child - Enforcement - Juvenile court jurisdiction - Presumption of parental fitness - Educational seminars** -
>
> (a)(1) In a suit for annulment, divorce or separate maintenance, where the custody of a minor child or minor children is a question, the court may . . . award the care, custody and control of such child or children to either of the parties to the suit or to both parties in the instance of joint custody or shared parenting, or to some suitable person, as the welfare and interest of the child or children may demand.

The statute plainly permits a Trial Court to award custody of a minor to "some suitable person, as the welfare and interest of the child or children may demand." However, that statute, presupposes that rights of constitutional magnitude are protected. *See Vogel v. Wells Fargo Guard Services,* 937 S.W.2d 856, 858 (Tenn. 1996). ("It is an accepted principle that the enactments of the General Assembly are presumed constitutional.") Before the Trial Court could exercise its statutory authority under T.C.A. § 36-6-101 to award custody to a non-parent over the objections of both parents, it had the duty to consider the parents' constitutional rights as they have been described by our Supreme Court in the recent case of *In re Swanson,* 2 S.W.3d 180 (Tenn. 1999), which held:

> [t]he federal and state constitutions require the opportunity for an individualized determination that a parent is either unfit or will cause

8

> substantial harm to his or her child before the fundamental right to the care and custody of the child can be taken away.

*In re Swanson,* 2 S.W.3d at 188, quoting *Stanley v. Illinois,* 405 U.S. 645, 650, 92 S.Ct. 1208, 31 L.Ed. 2d 551 (1972).

The *Swanson* case dealt with the termination of parental rights rather than with denial of physical custody to parents. However, parents' rights to physical custody of their children are also afforded constitutional protection. In *Hawk v. Hawk,* 855 S.W.2d 573 (Tenn. 1993), our Supreme Court held:

> Tennessee law, thus, upholds the state's authority as *parens patriae* when interference with parenting is necessary to prevent serious harm to a child.
>
> The federal cases that support the constitutional right to rear one's child and the right to family privacy also indicate that the state's power to interfere in the parent-child relationship is subject to a finding of harm to the child. . . . Federal cases . . . clearly require that some harm threaten a child's welfare before the state may constitutionally interfere with a parent's right to rear his or her child.
>
> The requirement of harm is the sole protection that parents have against pervasive state interference in the parenting process. As one author has stated:
>
>> For the state to delegate to the parents the authority to raise the child as the parents see fit, except when the state thinks another choice would be better, is to give the parents no authority at all . . . .

*Hawk v. Hawk,* 855 S.W.2d 573, 580 (Tenn. 1993).

The *Hawk* decision was upheld by our Supreme Court in 1995:

> After an extensive review of prior decisions of this Court and cases from other jurisdictions, the court in *Hawk v. Hawk* expressly rejected the proposition that the courts may engage in best interest analysis without first determining the threshold issue – substantial danger of harm to the child. The Court stated:
>
>> In light of [the constitutional right of privacy

9

> acknowledged in *Davis v. Davis,* 842 S.W.2d 588
> (Tenn. 1992) ], we believe that when no substantial
> harm threatens a child's welfare, the state lacks a
> sufficiently compelling justification for the
> infringement on the fundamental right of parents to
> raise their children as they see fit.

*Simmons v. Simmons,* 900 S.W.2d 682, 683-684 (Tenn. 1995). In *Hawk* and *Simmons,* our Supreme Court denied visitation rights in favor of grandparents when parents chose not to permit such visitation. The Supreme Court afforded the parents a right under the constitution to "raise their children as they see fit." *Simmons* at 684. Clearly, if parents have a constitutional right to prevent grandparents' visitation unless a risk of substantial harm will result, those same parents have a constitutional right to prevent the award of custody to a grandparent over their objections unless there is a showing of substantial danger of harm. *See also, In Re Askew,* 993 S.W.2d 1 (Tenn. 1999).

Mother argues that the Trial Court made no such "individualized determination that a parent is either unfit or will cause substantial harm to [the child]." Father argues that the evidence in the record preponderates in favor of a finding that custody by the Mother will cause substantial harm to the child but no such evidence exists as to the Father, and, therefore, he should have been awarded custody.

In awarding custody of Dylan to his grandmother, who had not sought custody, the Trial Court stated:

> This Court, in all candor, to put it mildly and to put it nicely, does not
> feel like that either of these parties can provide the necessary care and
> nurturing this child needs. This Court would be remiss; the Court
> does not think as far as the proper relationship for the child and the
> nurturing and care that the mother is presently capable of doing that
> . . . This is one of those unfortunate situations where as between the
> parties, as far as the care and custody of this child, the Court does not
> feel real positive about either one. The father could not care for this

10

child without the support of his mother.  Fortunately she's been there . . . based upon what the Court finds to be the overwhelming deficiencies of the parties, the Court is going to award the absolute care, custody and control of this child to Ms. Finchum pursuant to T.C.A. § 36-6-101.

Nowhere in the Trial Court's explanation of the basis for its judgment is there any finding that awarding custody of Dylan to either of his parents would cause Dylan to be at risk of "substantial danger of harm." We have carefully reviewed the record in this case and find it to be lacking in evidence that neither parent could assume custody of Dylan without causing the child substantial harm.  The Trial Court, understandably, sought to place Dylan in the best situation possible.  There are serious difficulties to be overcome before either parent can provide appropriate care of this child. There appear to be serious  dangers involved in the child's involvement with one or more of mother's relatives.  However, absent a showing that neither parent can be the primary custodian without substantial danger of harm to the child, we hold the Trial Court erred in awarding the care, custody, and control of the child to a non-parent. The Trial Court should apply the factors set forth in T.C.A. § 36-6-106 to determine which of the two parents is comparatively more fit to have custody of Dylan.  Only if the Court first concludes that neither parent is fit and that awarding custody to either parent would put Dylan at risk of substantial danger of harm should the Court consider any other alternative custodian.

## CONCLUSION

For the reasons herein stated, the Judgment of the Trial Court awarding custody of Dylan Holland to Judy Fincham, his paternal grandmother, is vacated.  The case is remanded for a new trial, at which time the Trial Court shall conduct a comparative fitness analysis of the child's parents and award custody of the child to one or both of his parents based on their comparative

11

fitness unless the Trial Court finds that to do so would result in substantial danger of harm to the child.  Only if such a finding of substantial danger of harm is made shall the Trial Court consider awarding custody and control of Dylan to some suitable person other than the parents.  Costs of this appeal are assessed one-half to Appellant, Deborah Ann Holland and one-half to Appellee, Jason Keith Holland.

_____
D. MICHAEL SWINEY, J.

**CONCUR:**

_____
HOUSTON M. GODDARD, P.J.

_____
HERSCHEL P. FRANKS, J.

12