IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
April 16, 2002 Session

# DONNA J. (FINKS) BUNKER v. ROGER FINKS

**Appeal from the Circuit Court for Hamilton County**
**No. 96DR0800     L. Marie Williams, Judge**

**FILED MAY 8, 2002**

**No. E2001-01496-COA-R3-CV**

Donna J. (Finks) Bunker ("Mother") and Roger Finks ("Father") were divorced in Ohio in 1993. The parties had two minor children. Mother and the children relocated to Chattanooga, Tennessee, and Father stayed in Ohio. The Ohio Divorce Decree was brought properly before the Tennessee Trial Court. Father filed a petition seeking a change of custody and visitation, while Mother filed a cross-petition seeking an increase in child support. The Trial Court found that while Father proved a material change in circumstances, he failed to carry his burden of showing that a change of custody was warranted. The Trial Court also restricted Father's visitation with the children to take place only in Chattanooga. The Trial Court did not increase Father's child support obligation. Both Father and Mother raise issues on appeal. Father's issues on appeal concern custody and visitation, primarily of the parties' younger child ("Younger Child"). We affirm, as modified, and remand.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed
as Modified; Case Remanded.**

D. MICHAEL SWINEY, J., delivered the opinion of the court in which HERSCHEL P. FRANKS, J., and CHARLES D. SUSANO, JR., J., joined.

Catherine M. White, Chattanooga, Tennessee, for the Appellant, Roger Finks.

Leslie B. McWilliams, Chattanooga, Tennessee, for the Appellee, Donna J. (Finks) Bunker.

# OPINION

## Background

Mother and Father were divorced in Ohio in 1993. They have two minor children.[1] The Ohio Divorce Decree incorporated a shared parenting plan which contemplated both Mother and Father serving as "residential parents" of both children with Mother as the primary custodian; granted Father visitation; and ordered Father to pay child support. In 1993, Mother and the children moved to Chattanooga, Tennessee, and still live there today. Father lives a few miles from his parents and sister in Ohio.

In 1996, Mother filed a Petition to Register and Modify Foreign Custody Order in the Trial Court in Hamilton County. In this petition, Mother sought a modification of Father's visitation schedule. Father filed an Answer and Counter-Petition denying that his visitation scheduled should be modified. Father also requested the Trial Court modify custody to award him custody of the children. As support for his request to modify custody, Father alleged Mother had numerous live-in boyfriends and was uncooperative with Father regarding the children. Father also alleged Mother had set upon a course of alienating the children from him. In August 1996, the Trial Court entered an Order ("1996 Order") granting Mother's request to register the Ohio Divorce Decree, modified Fathers' visitation schedule, denied Father's request to modify custody, increased Father's child support obligation, and ordered counseling for the children to take place in Ohio and Tennessee.[2] The Trial Court, acting *sua sponte*, in its 1996 Order, also entered a permanent restraining order against both parties, enjoining them from making derogatory remarks about the other party or allowing anyone else from doing so in front of the children.

The next pleading filed was Father's Petition for Contempt and to Address Existing Parenting Issues and/or Custody filed in June 2000. Father alleged a number of grounds for his petition, including Mother's interference with his Spring Break and summer visitation and telephone contact with the children and her failure to set up counseling with the Chattanooga counselor as ordered by the 1996 Order. Father also alleged that a material change of circumstances had occurred in the children's home environment such that a change in custody was warranted. Father alleged that Mother's then husband, Dale Bunker, was physically abusive towards Mother and that Dale Bunker had been indicted for rape of a child. In addition to a change of custody, Father requested emergency mediation to address a number of issues, including summer visitation and custody issues.

The Trial Court ordered the parties to attend a parenting seminar and emergency mediation. The record shows that mediation failed. Thereafter, along with her reply to Father's

---

[1] The parties' older child is from a previous marriage of Mother's. The record shows Father adopted this child during the parties' marriage.

[2] In the 1996 Order, the Trial Court specified the Chattanooga counselor by name and ordered that the Chattanooga counselor would be responsible for selecting an Ohio counselor.

petition, Mother filed a counter-petition seeking an increase in Father's child support obligation due to an increase in his income and a reduction in his visitation time. Mother alleged the children were afraid of Father and that the children complained they did not want to visit Father for long periods of time.

Father filed a motion in October 2000, requesting the Trial Court address the issue of Thanksgiving and Christmas visitation because the children told Father they did not want to visit him. The Trial Court entered an order in December 2000 ("December 2000 Order"), holding that Father would exercise visitation with only the Younger Child over the upcoming Christmas Break. The Trial Court also ordered Father to arrange for the Younger Child to attend counseling in Ohio during Christmas visitation. The Trial Court stated that the Ohio counselor should contact the Younger Child's Chattanooga counselor to discuss her best interests.

Trial of the parties' pending petitions took place in April 2001. At the time of trial, the older child was nearly 17 years old, and the Younger Child was 10 years old. Two expert witnesses provided testimony. A psychologist, Dr. Jolie S. Brams, testified on behalf of Father by telephonic deposition. A licensed clinical social worker, Katie Rhodes, provided testimony at trial on behalf of Mother. The record shows that Brams' and Rhodes' opinions regarding the Younger Child were very different.

Dr. Brams testified she met separately with Father and the Younger Child one time during the Younger Child's visitation with Father in Ohio over the Christmas 2000 holidays. Dr. Brams testified the purpose of her session with Father and the Younger Child was to conduct a partial visitation and custody evaluation but that she had no opinion regarding with whom the Younger Child should be placed. Dr. Brams described Father as inflexible and rigid, not amenable to change, not a stellar parent, but a hard-working individual. While Dr. Brams stated that Father had done very little to improve his relationship with the children, Dr. Brams testified further that Father appeared to take care of the Younger Child and spoke of her with affection. Dr. Brams testified that while Father may be boring, Father could offer the Younger Child stability.

Dr. Brams characterized the Younger Child as having a mental health impairment that is causally-related to her upbringing by Mother and opined that the Younger Child needed psychiatric counseling. Dr. Brams also predicted that the Younger Child would, in the future, have a personality disorder. The Younger Child related to Dr. Brams a number of disturbing matters regarding Mother and their home life in Chattanooga, including that Mother's former husband, Dale Bunker, sexually molested the Younger Child's friend; the Younger Child witnessed Mother having sex with a man in a hotel room; Mother's present boyfriend and his child were living with Mother and the children; Mother told the Younger Child she hated the child's teacher and school and did not help the Younger Child with homework; the teen-aged older child sleeps with his girlfriend in his room; and Mother told the Younger Child that if her paternal grandparents in Ohio were nice to her, it was a lie. Dr. Brams testified the Younger Child was not a happy child and told her she did not want to call Father "father" or anything else. Dr. Brams testified the Younger Child had been taught to devalue and reject those who love her and that the Younger Child's characteristics suggested she

was caught in a loyalty bind. Dr. Brams also believed the Younger Child may have an eating disorder. Dr. Brams' recommendation to the Trial Court, in addition to psychiatric counseling for the Younger Child, was that Father visit with the Younger Child in a neutral setting, for example, the guardian *ad litem's* office in Chattanooga, where the Younger Child and Father could talk without external pressures.

Katie Rhodes testified she first met Mother and the Younger Child in March 2001, and at the time of trial, had met with the Younger Child approximately six times. Rhodes testified Mother's stated purpose for bringing the Younger Child to her was Mother's concern that the Younger Child may have an eating disorder and may have difficulty with both parents. Rhodes testified she found no clinical depression present in the Younger Child, nor did she find that the Younger Child was overeating. Rhodes also testified the Younger Child appeared comfortable and had a normal affect. Like Brams, however, Rhodes found that the Younger Child felt caught between her parents. Rhodes, however, found the Younger Child had neither a mental health impairment nor a profound emotional disturbance. Rhodes testified the Younger Child, instead, had transient depression during stressful events. Rhodes did not attribute this problem to the Younger Child's upbringing by Mother. Rhodes testified the Younger Child did not relate any of the negative incidents regarding Mother she had related to Dr. Brams. Rhodes found the Younger Child did not feel as though she and Father had a good relationship and that during visitation in Ohio, the Younger Child gets bored and does not feel comfortable. Rhodes' recommendation was that Father and the Younger Child have more frequent, but shorter visits.

Father testified Mother had repeatedly interfered with his exercise of visitation with the children and his telephone contact with the children. Father testified he did not get to exercise visitation with the children over their Spring Break in 2000. Likewise, for Thanksgiving Break in 1999, the children told Father they wanted to stay in Chattanooga instead of visiting him in Ohio. Father also was concerned about the presence of domestic violence in Mother's household when she was married to Dale Bunker and about Bunker's sexual molestation of the Younger Child's friend. Father testified Mother did not tell him about these matters. Father also testified Mother previously had been treated for alcohol abuse and recalled a recent telephone conversation with Mother on Easter during which she sounded intoxicated. Furthermore, Father testified he believed Mother was intentionally attempting to alienate the children from him. In addition, Father's mother testified that beginning in 1998, she noticed a change in the children's demeanor in that both children began to act withdrawn. Moreover, Father testified that despite the court-ordered counseling in the 1996 Order, Mother failed to seek counseling for the Younger Child.

The record shows Mother did not dispute that Bunker had assaulted her on one occasion, testifying that Bunker had hit her with his fist and another object, possibly a tire iron, in the front yard of their home. Mother also did not dispute that Bunker had sexually molested a friend of the Younger Child. Mother testified that the Younger Child had reported the abuse to her in April 1999. Mother testified that after discussing the matter with the Younger Child and the victim, Mother reported the molestation to Child Protective Services and cooperated with the police in securing Bunker's arrest and conviction for attempted rape of a child. Mother testified she divorced

Dale Bunker in December 2000.[3] Mother testified she and Bunker were married in 1995, and, until the report of molestation, she believed they had a good marriage. According to Mother, she had no earlier indication that Bunker was sexually molesting any children. Mother, however, testified she and Bunker still co-own a business together and that she sees him daily at work since he is out of jail on work-release.

Despite the Younger Child's report to Dr. Brams, Mother denied living with any man except Bunker and testified that her current boyfriend has stayed overnight only on two occasions. The older child testified Mother does not have any overnight male guests and that Mother's boyfriend was not living with them. Mother also denied having sex with a man in a hotel room where the Younger Child was present. Mother and the older child denied that Mother had been drinking when she had the telephone conversation with Father on Easter. Mother also denied having a problem with alcohol or being treated for alcohol dependency, but admitted she had attended Alcoholics Anonymous meetings and been treated in an alcohol treatment facility. Mother claimed the treatment actually was for depression.

With respect to Father's allegations that Mother was attempting to alienate the children from Father, Mother testified she wants the Younger Child and Father to rebuild their relationship. Mother denied Father's allegations that she interfered with his visitation and telephone contact with the children and testified that in the six to seven-month period prior to trial, Father had called the children approximately four times. Mother testified the Younger Child, around the time of her visitation with Father, would become agitated, frequently complain, and wet the bed. Mother also testified that although the Younger Child did not see the court-ordered counselor in accordance with the 1996 Order, the Younger Child saw her school counselor from 1996-99.

Both children testified at trial. The older child testified Father was very controlling and was unwilling to change his behavior and that communicating with Father was difficult. The Younger Child testified Mother told her they were at trial so the children would not have to go to Ohio. The Younger Child testified she does not like visiting Father and his family in Ohio and that she does not enjoy talking to Father. The Younger Child calls Father by his first name and does not recall the time period when Father lived with Mother and the children. The Younger Child testified she does not like Father because he yells. Despite Dr. Brams' report otherwise, the Younger Child denied that Mother talked to her about Father's parents and denied that Mother's current boyfriend was living with them.

---

[3] Mother testified that upon hearing about the molestation in April 1999, she immediately reported it to Child Protective Services. According to Mother, she was instructed not to confront Dale Bunker about the claim. Mother testified that 4 months later, in August 1999, she was questioned by a police detective. Mother testified it was at this time that she obtained a protective order against Dale Bunker.

After trial, the Trial Court entered a Memorandum Opinion and an Order ("Final Order").[4]  In its Memorandum Opinion, the Trial Court held, in pertinent part, as follows:

> Upon hearing the evidence in this cause, including discussions with the children, the Court finds significant issues concerning the well-being of the children have been raised by [Father] with some validity. However, the Court finds he has not carried his burden of proof necessary to name [Father] the primary residential parent.  The Court finds a material change of circumstances resulting in substantial harm to the children has occurred in the deterioration of the relationship between the Father and the children.  Therefore, the residential schedule must be changed.  The Court must address the absence of a meaningful relationship between [Father] and the two children and craft a residential schedule designed to encourage and enhance the father-child relationship.  The Court ORDERS the primary residence shall remain with the Mother.  The Court finds both children desirous of establishing a strong relationship with [Father] in the future. However, it is necessary for [Father] to cooperate in this process and to rebuild the relationship under the supervision of the Court and without the interference of [Mother].

> * * * * * * *

> The Court finds [Mother] has failed to cooperate with [Father] in affording him residential time with the children and has manipulated and sabotaged those efforts.  The Court finds [Mother] has failed to obey the Court's orders in arranging and implementing the counseling the Court ordered and finds her actions in this regard are a further indication of her intent to undermine the father-child relationship.  Her testimony that she wants the children to have a good relationship with their father is contradicted by her actions and her demeanor.  Were it not for the status of the (or the absence of a) relationship between the children and their father at this time, the Court would modify the decision-making authority and the residential time of the Mother.  However, despite [Mother's] failure to obey Court orders, the children's best interests must be considered and the Court finds it appropriate for [Father] to visit with the children in Chattanooga under the dictates of this Order.

---

[4] The Trial Court incorporated the Memorandum Opinion and a Permanent Parenting Plan into its Final Order.

The Trial Court, in its Memorandum Opinion, limited Father's visitation to take place strictly in Chattanooga. In its Final Order entered September 6, 2001, the Trial Court set Father's child support obligation at $968.30 per month, finding that no upward deviation was warranted because of Father's forthcoming travel-related expenses for visitation in Chattanooga. The Trial Court ordered, in its Final Order, that Father and the children enter into counseling in Chattanooga and ordered that Mother comply with the recommendations of the counselor. The Trial Court stated that "[t]he counselor may make recommendations to the parties concerning an expansion in [Father's] residential schedule." Additionally, in its Final Order, the Trial Court found Mother in contempt for failing to follow the Trial Court's orders regarding Father's visitation and counseling for the children in Chattanooga but reserved sentencing.

After entry of the Memorandum Opinion, Father filed a Tenn. R. Civ. P. 62 Motion to Stay, requesting that the Trial Court stay enforcement of the Order. As grounds, Father contended that he wished to exercise visitation with the Younger Child in Ohio since there was no proof at trial that the Younger Child had ever suffered harm while visiting Father in Ohio. The Trial Court denied Father's Motion to Stay. Thereafter, Father filed a Motion for Clarification requesting the Trial Court clarify whether the costs related to Dr. Brams' evaluation and deposition in the amount of approximately $2,090 should be divided equally between the parties. Father argued in his motion that Dr. Brams' evaluation fees were incurred as a result of the Trial Court's December 2000 Order that the Younger Child was to see a counselor while visiting Father in Ohio over Christmas Break. The Trial Court ordered Mother to pay only $300 of Dr. Brams' fees.

Father appeals. We affirm, as modified, and remand.

## Discussion

On appeal, and although not exactly stated as such, Father raises the following issues for this Court's consideration: (1) whether the Trial Court erred in denying Father's request for a change of custody; (2) whether the Trial Court erred in modifying Father's visitation schedule; (3) whether the Trial Court erred in denying Father's Motion to Stay; and (4) whether the Trial Court committed error when it ordered Mother to pay only $300 of Dr. Brams' total fees of approximately $2,090, instead of ordering Mother to pay $1,045.

Mother raises one additional issue on appeal. Mother contends the Trial Court erred in failing to find that an upward deviation in Father's child support obligation was warranted, given Father's increase in income and less-than-average visitation time.

Our review of the Trial Court's findings of fact is *de novo* upon the record, accompanied by a presumption of correctness of the findings of fact of the Trial Court, unless the preponderance of the evidence is otherwise. Tenn. Rule App. P. 13(d); *Alexander v. Inman,* 974 S.W.2d 689, 692 (Tenn. 1998). A Trial Court's conclusions of law are subject to a *de novo* review with no presumption of correctness. *Ganzevoort v. Russell,* 949 S.W.2d 293, 296 (Tenn. 1997).

The crucial issues in this matter are the custody of the Younger Child and the limitations placed upon Father's visitation with the Younger Child. Therefore, we will address these issues first. Determinations regarding custody and visitation "'are peculiarly within the broad discretion of the trial judge.'" *Eldridge v. Eldridge*, 42 S.W.3d 82, 85 (Tenn. 2001) (quoting *Suttles v. Suttles*, 748 S.W.2d 427, 429 (Tenn. 1988)). In addition, this Court has recognized that custody and visitation decisions "often hinge on subtle factors, including the parents' demeanor and credibility. . . ." *Gaskill v. Gaskill*, 936 S.W.2d 626, 631 (Tenn. Ct. App. 1996). Accordingly, on appeal, the Trial Court's custody and visitation decisions will not be reversed absent a showing of abuse of discretion. *Id.* Likewise, the Trial Court's decision not to grant Father's Motion to Stay is subject to an abuse of discretion review. *Sanjines v. Ortwein & Assoc., P.C.*, 984 S.W.2d 907, 909 (Tenn. 1998). Under the abuse of discretion standard of review, this Court will not reverse the decision of a trial court "'so long as reasonable minds can disagree as to propriety of the decision made.'" *Eldridge v. Eldridge*, 42 S.W.3d at 85 (quoting *State v. Scott*, 33 S.W.3d 746, 752 (Tenn. 2000) & *State v. Gilliland*, 22 S.W.3d 266, 273 (Tenn. 2000)). A trial court's decision will not be reversed for abuse of discretion unless the trial court "'applie[d] an incorrect legal standard, or reache[d] a decision which is against logic or reasoning that causes an injustice to the party complaining.'" *Id.* (quoting *State v. Shirley*, 6 S.W.3d 243, 247 (Tenn. 1999)). This Court, while using the abuse of discretion standard, is not permitted to substitute its judgment in place of the trial court. *Id.*

As discussed, Mother brought the original Ohio Divorce Decree before the Tennessee Trial Court, and jurisdiction is not disputed. Under Tennessee law, a trial court's original custody decree, once it is entered, is *res judicata* and may not be modified unless a material change of circumstances has occurred such that the child's welfare requires a modification of the custody decree. *Hoalcraft v. Smithson*, 19 S.W.3d 822, 828 (Tenn. Ct. App. 1999). Tennessee law gives a "strong presumption in favor of continuity of placement." *Placencia v. Placencia*, 3 S.W.3d 497, 503 (Tenn. Ct. App. 1999).

The party seeking a modification of the custody decree has the burden of proof to show a material change of circumstances has occurred such that custody should be modified. *Hoalcraft v. Smithson*, 19 S.W.3d at 828. Our Supreme Court, in discussing what constitutes a material change of circumstances, held "[i]n general, the change must occur after the entry of the order sought to be modified and the change cannot be one that was known or reasonably anticipated when the order was entered." *Id.* at 829. In addition, the changed circumstances must be that of the child's and not the circumstances of either or both parents, and the circumstances must materially affect the child. *Id.* Child custody decrees have been modified by Tennessee courts based upon "the character of the custodian; the conduct of the custodian; and the child's welfare." *Id.* The preference of the child at issue is only one of the factors to be considered when determining custody. *Id.*

Once the trial court determines the moving party has carried his burden of showing that a material change of circumstances has occurred, the court must determine whether a change in custody would serve the best interests of the child at issue. *Id.* The trial court, when making a best interest determination, must assess the comparative fitness of the parties. *Placencia v. Placencia*,

3 S.W.3d at 503. While there is no bright line comparative fitness test, the statutory factors provided by Tenn. Code Ann. § 36-6-106 are used by courts in making this comparative fitness determination. *Id.; see also Gaskill v. Gaskill*, 936 S.W.2d at 630 (listing additional factors).[5] Generally, custody arrangements which promote the relationship between the child and both the custodial and non-custodial parents are preferable. *Turner v. Turner*, 919 S.W.2d 340, 346 (Tenn. Ct. App. 1995).

---

[5] Tenn. Code Ann. § 36-6-106(a) provides:

In . . . any other proceeding requiring the court to make a custody determination regarding a minor child, such determination shall be made upon the best interest of the child. The court shall consider all relevant factors including the following where applicable:

1.  The love, affection and emotional ties existing between the parents and child;

2.  The disposition of the parents to provide the child with food, clothing, medical care, education and other necessary care and the degree to which a parent has been the primary caregiver;

3.  The importance of continuity in the child's life and the length of time the child has lived in a stable, satisfactory environment; provided, that where there is a finding, under 36-6-106(8), of child abuse, as defined in §§ 39-15-401 or 39-15-402, or child sexual abuse, as defined in § 37-1-602, by one (1) parent, and that a non-perpetrating parent has relocated in order to flee the perpetrating parent, that such relocation shall not weigh against an award of custody;

4.  The stability of the family unit of the parents;

5.  The mental and physical health of the parents;

6.  The home, school and community record of the child;

7.  The reasonable preference of the child if twelve (12) years of age or older. The court may hear the preference of a younger child upon request. The preferences of older children should normally be given greater weight than those of younger children;

8.  Evidence of physical or emotional abuse to the child, to the other parent or to any other person; provided, that where there are allegations that one (1) parent has committed child abuse, [as defined in §§ 39-15-401 or 39-15-402], or child sexual abuse, [as defined in § 37-1-602], against a family member, the court shall consider all evidence relevant to the physical and emotional safety of the child, and determine, by a clear preponderance of the evidence, whether such abuse has occurred. The court shall include in its decision a written finding of all evidence, and all findings of facts connected thereto. In addition, the court shall, where appropriate, refer any issues of abuse to the juvenile court for further proceedings;

9.  The character and behavior of any other person who resides in or frequents the home of a parent and such person's interactions with the child;

10. Each parent's past and potential for future performance of parenting responsibilities, including the willingness and ability of each of the parents to facilitate and encourage a close and continuing parent-child relationship between the child and the other parent, consistent with the best interest of the child.

In its Memorandum Opinion, the Trial Court found that Father carried his burden of proving a material change of circumstances had occurred. This material change was the deterioration of the relationship between Father and the children. The Trial Court, however, found that Father did not carry his burden of establishing that a change of custody was warranted. While the Trial Court did not specifically state that a change of custody would not be in the Younger Child's best interests, this finding is implied from the Trial Court's denial of Father's request to change custody.

On appeal, Father contends the Trial Court erred in failing to change custody since he established a material change in circumstances, that is, the deterioration of his relationship with his children, and showed that this change was due to Mother's conduct. The Trial Court found that Mother was, at least, partially at fault for the material change in circumstances. The Trial Court found Mother had sabotaged and undermined Father's visitation and his relationship with the children and found that Mother's testimony regarding her wish for a good relationship between Father and the children was not credible. Moreover, the Trial Court held Mother in contempt for failing to comply with the Trial Court's orders regarding Father's visitation and counseling for the children.

Because the older child will turn 18 years old in less than two months from the date of this Opinion, we will focus our discussion on the custody and visitation issues solely on the Younger Child. This is not to say that a meaningful relationship between Father and his soon-to-be 18 year old child cannot be achieved. We, however, acknowledge that this Court, due to the older child's age, is powerless to take any effective steps to help create any such relationship. The power to create such a relationship now lies solely with Father and his soon-to-be adult child.

Father, as the moving party, had the burden of establishing a material change in the Younger Child's circumstances such that a change of custody is warranted *and* that the custody change would serve the Younger Child's best interests. *Hoalcraft v. Smithson*, 19 S.W.3d at 828. While the Trial Court found Father carried his burden of proof of establishing a material change of circumstances, it impliedly found that a change in custody would not serve the Younger Child's best interests. While we acknowledge the record supports the Trial Court's finding that Mother is, at least partially, to blame for the decline of Father's and the Younger Child's relationship and the Younger Child's feelings for Father, the Trial Court's decision not to modify the existing custody arrangement neither was against reason or logic, nor did the Trial Court apply an incorrect legal standard in making this decision. *See Eldridge v. Eldridge,* 42 S.W.3d at 85. Accordingly, we find no error in the Trial Court's decision not to modify the existing custody arrangement, and we affirm this portion of the Final Order.

We now turn to Father's issue on appeal regarding the Trial Court's decision to limit Father's visitation with the Younger Child strictly to Chattanooga, thus eliminating Father's exercise of visitation at his home in Ohio. As in custody matters, courts, when determining visitation, are to be guided by the best interests of the child at issue. *Turner v. Turner*, 919 S.W.2d at 346. Our

Supreme Court determined that when reviewing a trial court's decision regarding visitation, "the child's welfare is given 'paramount consideration' . . . and the 'right of the noncustodial parent to reasonable visitation is clearly favored.'" *Eldridge v. Eldridge*, 42 S.W.3d at 85 (quoting *Luke v. Luke*, 651 S.W.2d 219, 221 (Tenn. 1983) (citations omitted)). Courts may limit or eliminate the non-custodial parent's right to visitation where "there is definite evidence that to permit . . . the right would jeopardize the child, in either a physical or moral sense.'" *Id.* (quoting *Luke v. Luke*, 651 S.W.2d at 221); *see also* Tenn. Code Ann. § 36-6-301 (providing that after a custody determination and upon the request of the non-custodial parent, the court shall grant visitation "unless the court finds, after a hearing, that visitation is likely to endanger the child's physical or emotional health. . . .").

Father argues the Trial Court erred by requiring his visitation with the Younger Child to take place only in Chattanooga. Father contends the record contains no proof that Father harmed either child during their visitation periods in Ohio. Father also argues that the Younger Child's wishes not to visit Father and her negative feelings about Father are not enough to warrant such a restriction on his right to visitation.

The record shows Father's own expert witness, Dr. Brams, testified that her recommendation was for Father and the Younger Child to work on their relationship by meeting in a neutral setting, such as the Guardian *ad litem's* office in *Chattanooga*. The other mental health professional who provided testimony, Katie Rhodes, recommended Father and the Younger Child begin rebuilding their relationship by visiting for shorter periods of time. In addition, the Younger Child's testimony shows that, while her home life with Mother is not perfect by any means, she does not like to visit Father and his extended family in Ohio and has an extremely strained relationship with Father. Moreover, the Memorandum Opinion shows the Trial Court, in limiting Father's visitation to Chattanooga only, was attempting to meet the best interests of the children. While Mother's conduct was a significant cause of the problems between the Younger Child and Father, this Court has recognized that visitation and custody determinations "'should reflect the realities of all family members and should promote conduct that is reasonable in light of all the circumstances.'" *Helson v. Cyrus*, 989 S.W.2d 704, 708 (Tenn. Ct. App. 1998) (quoting *Jones v. Jones*, No. 01A01-9607-CV00346, 1997 Tenn. App. LEXIS 132, at *12 (Tenn. Ct. App. Feb. 26, 1997), *no appl. perm. app. filed*).

While limiting Father's visitation with the Younger Child to Chattanooga was not an abuse of discretion, we hold that, under these circumstances and in light of Father's right to exercise visitation, imposing such a limitation upon Father's visitation *indefinitely* constitutes error. To limit indefinitely Father's visitation with the Younger Child, who at the time of trial was 10 years old, to take place only in Chattanooga would essentially reward Mother for her misconduct and efforts to sabotage the Father's and Younger Child's relationship. Moreover, the Younger Child's visitation with Father and his family in Ohio may well facilitate their relationship. *See* Tenn. Code Ann. § 36-6-301 (providing that "the court shall, upon request of the non-custodial parent, grant such rights of visitation as will enable the child and the non-custodial parent to maintain a parent-child relationship . . . ."). It is undisputed that it is in the Younger Child's best interest to have a positive relationship

with Father. We believe this best can be accomplished by allowing visitation in Ohio. Accordingly, on remand, the Trial Court is directed to hold a hearing within 60 days of the filing date of this Opinion. At this hearing, the Trial Court is to set a date no later than 6 months after this hearing on remand for the Younger Child's visitation with Father in Ohio to recommence.

We next consider Father's issue on appeal regarding whether the Trial Court erred in denying Father's Motion to Stay in which Father requested the Trial Court to stay the portion of the Final Order that restricted Father's visitation to Chattanooga. Father's motion was filed under Tenn. R. Civ. P. 62 which provides, in pertinent part, the following:

> In . . . actions . . . that award, change or otherwise affect the custody of a minor child, an interlocutory or final judgment *shall not be stayed after entry unless otherwise ordered by the court. . . .*

Tenn. R. Civ. P. 62.01 (emphasis added). In light of the facts and circumstances presented by the record on appeal and our finding that such a restriction on Father's visitation, albeit for a limited period of time, will serve the Younger Child's best interests, we find that the Trial Court's refusal to stay its order requiring Father's visitation to be in Chattanooga was not error.

Next, we address Mother's argument on appeal that the Trial Court erred in setting Father's child support obligation at $968.30 per month. Mother contends Father's gross income for the year 1999 was $49,360.80 and for the first 10 months of 2000 totaled $50,428.64. Mother argues that, based upon Father's earnings for 1999 and anticipated earnings for 2000, Father's gross monthly income, for purposes of setting child support, should be averaged to total $4,535 per month. Mother argues that, under the Child Support Guidelines ("Guidelines"), Father's average gross monthly income warrants a child support obligation of $1,061 per month. In addition, Mother contends Father's less-than-average visitation time justifies an upward deviation from the Guidelines amount.

Tenn. Code Ann. § 36-5-101(e)(1)(A), discusses the application of the Guidelines, and provides, in pertinent part, the following:

> the court shall apply as a rebuttable presumption the child support guidelines . . . . If the court finds that evidence is sufficient to rebut this presumption, the court shall make a written finding that the application of the child support guidelines would be unjust or inappropriate in that particular case, in order to provide for the best interest of the child(ren) or the equity between the parties. Findings that the application of the guidelines would be unjust or inappropriate shall state the amount of support that would have been ordered under the child support guidelines and a justification for the variance from the guidelines.

-12-

*See also* Tenn. Comp. R. & Regs., ch. 1240-2-4-.01 (2)-(3); ch. 1240-2-4-.02(7).

The Guidelines set the "minimum base" of a child support obligation which is a "flat percentage of the obligor's net income . . . depending on the number of children . . . ." Tenn. Comp. R. & Regs., ch. 1240-2-4-.02(5) & .03(2); *Barnett v. Barnett*, 27 S.W.3d 904, 906 (Tenn. 2000). In this matter, Father's child support obligation is 32% of his net income since two minor children are involved. Tenn. Comp. R. & Regs., ch. 1240-2-4-.03(5). The Final Order, however, shows the Trial Court, in setting Father's child support obligation, took into account Father's travel-related expenses for visitation with the children in Chattanooga, stating as follows:

> No upward deviation in [Father's] support obligation is made for his
> reduced time with the minor children to allow him monies to pay for
> his transportation to Chattanooga.

This Court has recognized that travel-related expenses for visitation may warrant a deviation from the Guidelines amount. *Leach v. Leach*, W2000-00935-COA-R3-CV, 2001 Tenn. App. LEXIS 467, at * 18 (Tenn. Ct. App. June 25, 2001), *no appl. perm. app. filed*. Under the facts and circumstances contained in the record on appeal, we hold that Father's child support obligation as ordered by the Trial Court is appropriate. As discussed, Father's visitation in Chattanooga will serve the best interests of both children and will facilitate Father's and the children's relationship. The Guidelines contemplate serving the best interests of the child involved, stating that "[i]n deviating from the guidelines, primary consideration must be given to the best interest of the child(ren) for whose support the guidelines are being utilized." Tenn. Comp. R. & Regs., ch. 1240-2-4-.04(5). In light of our holding recommencing the Younger Child's visitation with Father in Ohio and the older child turning 18 in June 2002, the Trial Court may, as it deems necessary, address the issue of child support at the hearing on remand.

The final issue for our consideration is Father's issue regarding the Trial Court's denial of Father's request that Mother pay one-half of Dr. Brams' fees which totaled $2,087.50 and the Trial Court's order that Mother only pay $300 of Dr. Brams' fees. Father raised this issue in his Motion for Clarification and attached a statement of Dr. Brams' fees. Dr. Brams' fee statement includes charges related to the evaluation, preparation of report and deposition. The Trial Court, after a hearing was held on the matter, ordered Mother to pay $300, without specifying what portion of Dr. Brams' fees Mother was paying.

While the Trial Court did not provide its reasoning for limiting Mother's share of Dr. Brams' fees to $300, the record shows that Father sought counseling for the Younger Child with Dr. Brams during visitation over Christmas Break 2000 after the Trial Court ordered Father "to arrange for the Younger Child to see a counselor. . . ." The record shows Dr. Brams conducted a partial visitation and custody evaluation with Father and Child instead of just a counseling session. Dr. Brams' involvement with the Younger Child can best be described as both satisfying the Trial Court's Order for the Younger Child to see a counselor and serving as an expert witness on Father's behalf. Father's Motion for Clarification, therefore, was essentially a motion for discretionary costs.

Tenn. R. Civ. P. 54.04(2) provides that "reasonable and necessary expert witness fees for depositions or trials . . ." are "allowable only in the court's discretion. . . ." Accordingly, the Trial Court's decision to award Father only $300 of Dr. Brams' fees is subject to an abuse of discretion review, and as a result, this Court "employ[s] a deferential standard when reviewing decisions either to award or deny discretionary costs." *Scholz v. S.B. Int'l, Inc.*, 40 S.W.3d 78, 84 (Tenn. Ct. App. 2000). In light of these facts and circumstances and due to the deference we give the Trial Court's decision regarding the award of discretionary costs, we find the Trial Court's order that Mother pay only $300 of these fees was not error.

## Conclusion

The judgment of the Trial Court is affirmed as modified and this cause is remanded. Upon remand, the Trial Court is directed to hold a hearing within 60 days of the filing of this Opinion to set a date-certain, no later than 6 months from the date of the hearing on remand, for the Younger Child's visitation with Father in Ohio to recommence and, if the Trial Court deems it necessary, to address the issue of child support upon the recommencement of visitation in Ohio, and for such further proceedings as may be required, if any, consistent with this Opinion and for collection of the costs below. The judgment of the Trial Court is affirmed in all other respects. The costs on appeal are assessed equally against the Appellant, Roger Finks, and his surety, and the Appellee, Donna J. (Finks) Bunker.

_____
D. MICHAEL SWINEY, JUDGE