IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
November 14, 2023 Session

## ANGELA LOUINE NIEMEYER v. GLENN PAUL NIEMEYER

**Appeal from the Circuit Court for Hamilton County**
**No. 17D2367          John B. Bennett, Judge**

_____

**No. E2022-01690-COA-R3-CV**

_____

This is a divorce action involving, *inter alia*, the classification of property, equitable valuation and division of marital property, and support for an alleged disabled adult child beyond the age of 21.  After our exhaustive review, we find that the preponderance of the evidence supports the trial court's determinations in this matter.  Therefore, we affirm the trial court's judgment in all respects.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court**
**Affirmed; Case Remanded**

JOHN W. MCCLARTY, J., delivered the opinion of the court, in which THOMAS R. FRIERSON, II, and KRISTI M. DAVIS, JJ., joined.

John P. Konvalinka, Chattanooga, Tennessee, for the appellant, Glenn Paul Niemeyer.

Sandra J. Bott and William H. Horton, Chattanooga, Tennessee, for the appellee, Angela Louine Niemeyer.

Christina Mincy, Chattanooga, Tennessee, guardian *ad litem*.

Misty L. Harris, Chattanooga, Tennessee, attorney *ad litem*.

## OPINION

### I. BACKGROUND

Angela Louine Niemeyer ("Wife") married Glenn Paul Niemeyer ("Husband") on September 5, 1992.  Two children were born of the marriage, Alexandra ("Ali") and

Brooke ("Scout"); both had reached the age of majority as of the date of this appeal.

During these proceedings, Wife was in her mid-50s and Husband turned 60. Wife has served as the general manager of the Bluff View Art District ("BVAD") in Chattanooga since 1993, a business primarily owned by her parents. According to Wife, her work schedule is continuous as she is on the BVAD property essentially 24/7 for security and liability reasons. Wife holds a law degree and passed the Tennessee Bar Exam, but she has never practiced law outside of using her skills on behalf of the family business. As of September 19, 2019, her annual salary was $85,000. Wife testified that she was the primary breadwinner for the family up until the last four or five years of the marriage. She claimed that Husband made "very little" income from 1993 until 2006 or 2008.

Husband had a Master's Degree at the start of the marriage and received a Doctorate in Molecular Biology approximately seven years into the marriage. He was employed by Auburn University from 1993 to 2008 and the University of Alabama in Birmingham from 2008 to 2015. Over that span of time, Husband lived in Alabama during the week and commuted home to Chattanooga on weekends. His Social Security earnings statements show zero reported income four out of five years from 1992 to 1996. His highest annual income from 1992 to 2002 was $37,700. Sometime around 2006 or 2008 to 2015, Husband began to contribute "anywhere from $1,000.00 to $2,000.00 per month depending on what the pay scale was for the particular year."

Upon losing funding for his research in 2015, Husband returned to Chattanooga. Wife's parents began to give the couple $500 per week, an increase from the $200 per week they previously contributed to help with Ali's expenses. Wife acknowledged that Husband worked for BVAD for four weeks in 2015 after returning from Alabama and "maybe" another four weeks in 2016. According to Wife, Husband was paid for the labor, received a 1099, and she reported the income on the parties' personal tax return. Husband was hired by the University of Tennessee at Chattanooga in 2016 and worked there through August of 2018. Wife claims Husband gave her a total of $3,300 in 2016 and $1,100 in 2017. Husband paid no support from November 2017 until February 2018, when he began to pay $600 per month for both children as part of a mediated agreement.

Wife and the children lived in an apartment in BVAD throughout the marriage. Wife was the primary caretaker for the children, including schooling, homework, events, medical appointments, and all aspects of daily life. Upon Husband's return to Chattanooga, Wife began spending the night at her parent's home. Husband remained in the marital residence with the children at night. Husband admitted that Wife was "about 150 yards" away. This arrangement lasted from late 2016 through 2017.

On November 1, 2017, Wife filed her complaint for divorce along with an ex parte petition for order of protection. Angie Supan, a 23-year BVAD employee, who worked weekends in the shop directly below the Niemeyer apartment, later testified to hearing

"loud yelling" and "angry screaming" from Husband throughout her employment. She claimed personal knowledge that the children were present during these episodes, which sometimes lasted 30 minutes. She overheard Wife's voice "in distress." Lisa Grafton, Wife's sister, also testified to observing Husband call Wife profane names and accusing her of multiple affairs, sometimes in front of Ali. She recalled witnessing Husband red faced and angry, and she viewed texts from him telling Wife he was coming and "you better make sure you're safe." According to Ms. Grafton, Husband stated in Ali's presence that he was not Scout's father. She described Scout's demeanor as happy outside the presence of Husband. Wife confirmed that the children had seen Husband's "uncontrollable rages," witnessed him spit in her face, and shout obscenities. She stated that the children would become sick to their stomachs during these outbursts.

On November 13, 2017, following a contested hearing, an order of protection ("OP") was entered that prohibited Husband from having contact with Wife and the children for one year. When the OP expired, an agreed restraining order was entered, which provided for no contact between the parties. A mediated agreement was adopted by the trial court on February 14, 2018, in which Husband agreed to attend family counseling with the children and to pay $600 per month in child support pending more accurate income and expense information. His stated income at that time was $3,433.34 per month.

In September 2018, Husband began working with the Centers for Disease Control and Prevention ("CDC") in Atlanta. He earned $78,444 per year at the CDC in 2019, where he participates in a federal pension plan and 401(k). Wife always had paid Husband's health insurance until he began employment at the CDC; she continued to pay his yearly car insurance through the date of trial in the amount of $2,095.32. The family counseling ceased when Husband moved to Atlanta in September 2018.

On October 22, 2018, Wife filed an amended complaint asserting that Ali was entitled to child support as an adult handicapped child pursuant to Tennessee Code Annotated section 36-5-102(k)(2). An agreed order dated October 31, 2018, provided that "any child support or other arrearage or credits shall be retroactive to the date of filing of the Complaint for Divorce."

The trial spanned a year, being heard on September 18, September 19, and December 5 of 2019, and January 14, January 16, and September 24 of 2020. The parties stipulated grounds for divorce existed and neither sought alimony. The parties own no jointly held real property. Wife has no retirement plan, pension, IRA or 401(k). The primary marital asset is Husband's Alabama teacher's retirement pension ("Pension"), with a gross monthly amount of $2,089.59. He began to draw the Pension after turning 60 in October 2020. On the second day of trial, the court ordered Husband to begin child support payments for Scout in the amount of $1,555.57 per month ($844.57 for 39% of private

school tuition and $711 in child support).[1]  The issue of support for Ali, who was not called to testify, was deferred.

## SCOUT

Jennifer Gardner Cummins, a licensed professional counselor, testified that she began seeing Scout in 2016 after Husband returned to the Chattanooga area.  Ms. Gardner Cummins reported that Scout had witnessed her father yelling, cursing, name calling, and throwing things.  It was reported that he once pushed Scout down while in an altercation with Ali.[2]  The therapist diagnosed Scout with parent/child relational problems due to the conflict and stress in the home in 2017.  Wife later related that when Scout was younger, she had responded to the yelling in the home by going into her room and entering her closet.

As noted above, Husband, Scout, and Ali engaged in family therapy from April 2018 through September 15, 2018, with Cindy Ensminger.  The appointments ceased once Husband moved to Atlanta.  Scout reported that she desired no contact with her father and displayed symptoms of anxiety following the Ensminger therapy sessions.

Ms. Gardner Cummins opined that Scout should have family therapy with Husband but expressed concern for the child.  According to the therapist, Scout cried upon thinking about reunification and stated that she wanted her father to seek treatment for his behavior.  It was agreed that Husband would attend counseling with Scout, with no contact outside of the therapy.  They restarted therapy during the trial around January or February 2020.  Husband ceased the appointments in April 2020.

Husband admitted his full-time presence in Chattanooga had a negative effect on the children and "even the family dog."  He acknowledged that his greatest failure is being a "poor father" and that he put his career ahead of everything else in his life.  Husband admitted to yelling, screaming, and calling his wife obscene names in front of the children and observed that his behavior had caused them harm.  He expressed sorrow for what he had put the children through and "wouldn't wish that on anybody."  He admitted to raising his voice to Ali and acknowledged that Scout had observed "explosive anger" from him

---

[1] By both parties' agreement, Scout began attending Girls Preparatory School ("GPS") in 2015. Tuition for the school year 2019-2020 was $24,807, excluding the cost of required school trips and equipment.  Husband was in favor of Scout attending GPS and signed the contract for her to enroll, but, according to Wife, he subsequently refused to contribute to her tuition and contended it was the responsibility of Wife and her father.  Wife paid the GPS tuition in the amount of $50,249 from November 1, 2017, the date the divorce was filed, through September 19, 2019.

[2] Husband asserts that he did not get in a physical fight with Ali.  He maintains that "Ali punched me in the chest.  I laughed at her …." and "I broke her brush and threw it."  He acknowledged that he became angry because "they had called her mother, and I knew her mother was taping everything."  He believed that Wife was going "to say that I'm abusing my children … because it's the only way for them to get me out of the house…."

toward Wife. During the trial, he became angry upon cross examination and admitted that Scout is afraid of him when he is upset. Husband conceded that he failed to follow the recommendations of the family therapist.

## ALI

Ali's disability is best described as developmental delays. Wife testified as follows regarding her older child: "She has severe disabilities. She's—she's very anxious. She has to stay with a set routine and as she is getting older, it is harder and harder to change that routine without her becoming very anxious and picking her fingers and other parts of her body." Wife related that Ali had issues with fine motor skills and language from a young age. Ali was tested and found unable to continue in a pre-kindergarten program at Bright School. She attended a resource program at the Lutheran School but was relocated to Silverdale Baptist Academy's IMPACT program by the third grade. Ali stayed in the IMPACT program, which is for children with moderate to severe disabilities, all the way through 12th grade. She never transitioned to any mainstream type of schooling. Wife also took Ali to Honors Learning Center and hired a private tutor two or three times a week, transporting Ali after school. During the summers, Ali would attend the IMPACT Program summer camp. She began going to therapy in the 12th grade. Ali has a "certificate of attendance" in place of a high school diploma.

Wife's expert witness was William Wray, a licensed clinical psychologist, a board certified disability consultant, and a board certified forensic examiner. He has a Master's Degree and an Ed.D. in Clinical Psychology. He has been licensed as a psychologist in Tennessee since 1980. Dr. Wray administered the Wechsler Adult Intelligence Scale, and three reading tests from the Woodcock-McGraw-Werder Mini-Battery of Achievement. He described Ali as "very naïve" and displaying patterns of being "intellectually limited." He found her test results to be in the "low, very low range." He stated: "If we generated an IQ score, prorated an IQ score, she would have an IQ score of around 60 based on the procedure I administered." He opined Ali would have a vocational access code rating of 1, on a scale of 1 to 6, which, according to Dr. Wray, means her comprehension would pose quite an impairment to her in terms of safety in the workplace. He described Ali's math skills as "extremely limited," noting that she could not perform simple problems involving money or collect change from a purchase. Her math rating was 1, or on a third-grade level, which generated a code 1 for vocational purposes. He found that she had reasoning/math/language code scores of 1/1/1, all very low. In Dr. Wray's opinion, Ali is "severely disabled," and he could not see her taking care of herself in the future without considerable guidance and support. He did not envision her entering the world of work, even with considerable supervision. Dr. Wray opined that Ali is at risk of being exploited; would need a highly sheltered job; and is unemployable in a competitive situation. He observed that there were no sheltered jobs in Chattanooga that Ali might reasonably manage. According to Dr. Wray, Ali's severe impairment was noticeable and would further deteriorate over time.

Wife and Husband both recognized that they "would be taking care of [Ali] the rest of her life." Husband contends that Ali's struggles do not rise to the level of a severe disability. He agreed her IQ is in the "60–70" range; Husband acknowledged that she cannot travel on her own, has never ridden a bicycle; cannot drive a car; and has trouble with math, time, and sensory issues. He indicated feeling uncomfortable with Ali living on her own and would be concerned about her physical well-being. He noted that Ali cannot cook and it is a struggle for her to "microwave some stuff." When asked where Ali could work outside of her family, he claimed that there are agencies for people with severe disabilities, such as Goodwill. He opined that Ali could be a greeter at a restaurant or answer phones in an office. He asserted a belief that she could take an Uber to work. Husband agreed that she cannot handle money.

Ali works 14 hours per week at BVAD with Ms. Grafton, the bookkeeper. Ms. Grafton described Ali's very limited abilities and frequent mistakes in trying to perform routine tasks, such as making copies on the copy machine, laminating items, and stamping checks. She observed Ali is productive at work about 5% to 10% of the time but otherwise plays with her phone or looks out the window. Ms. Grafton characterized Ali's job duties as "an exercise" for her; she has not seen any progress or improvement in Ali. She observed that it is very difficult for Ali to microwave a frozen dinner or make change for a dollar; she does not know the value of a dollar and cannot take public transportation. Ms. Grafton related that Ali cannot cross a busy street by herself because she does not know to look both ways and cannot judge when to go. She has a habit of picking at her fingers and becomes "preoccupied easy." Ms. Grafton noted that Ali does not socialize with people her own age.

Ms. Supan, who has known Ali since age two, observed that the young woman lacks the ability to drive a car, make change, write a check, or pay for meals. She has never seen Ali reading. She observed that Ali cannot cross the street unassisted and does not consistently watch for traffic. Ms. Supan testified that Ali cannot keep time, has never shopped for groceries, and primarily watches the others when she attends yoga class. According to Ms. Supan, Ali does not have a sense of her surroundings.

## WIFE'S SEPARATE PROPERTY

In 2014, Wife was gifted a percentage interest in BVAD. Restrictions exist on Wife's ability to sell her interest, with her parents having the right of first refusal. Wife holds an ownership interest in the following family-owned entities: River Gallery, Inc. ("RG"); BVAD; Portera Family Limited Partnership ("PFLP"); and Portera Family Management Limited Liability Company ("PFMLLC") (collectively, "Portera Entities"). Wife owns 100% of PFMLLC, which owns a 1% general partner interest in PFLP. Wife has a 38% ownership interest in BVAD and RG.

Wife's expert, Matthew Steltzman, testified that he oversees all valuation and litigation support services for his accounting firm. He has a Bachelor of Science in Finance and a Master's in Business Administration. Mr. Steltzman is a Certified Valuation Analyst according to the National Association of Certified Valuators and Analysts; he is an Accredited Senior Appraiser through the American Society of Appraisers. In his review, Mr. Steltzman interviewed Wife and analyzed the 2017 federal tax returns for the Portera Entities, the 2014 personal returns for Wife's parents, calculations prepared by Husband's counsel, the report of Husband's expert, an affidavit from a certified public accountant at the Decosimo accounting firm, and an email from an attorney at the Chambliss, Bahner & Stophel law firm. Mr. Steltzman opined that the value of Wife's minority interests in the Portera Entities currently had a negative value of ($-168,000) due to business losses since 2014, the year in which they were purportedly given to her. According to Mr. Steltzman, BVAD and RG do not earn money, and as those companies that Wife owns a greater percentage interest in lose money, she is losing more in those entities. Mr. Steltzman reported that RG had liabilities of $275,000 in 2014 and $414,534 in 2017.

According to Mr. Steltzman, the value of Wife's interests on the 2014 gift tax return, which he accepted, was $177,736. The gift tax return used a balance sheet approach, with intercompany receivables/payables and shareholder loans from Wife's father included on the balance sheet. Mr. Steltzman observed that the 2017 tax return for BVAD reflects the shareholder loans were reduced by $59,039 during the year, indicating the loans were being repaid. In his view, there is no indication that the loans were anything other than debt.

Husband's expert, Shannon Farr, a Certified Public Accountant, testified that based upon her review, the Portera Entities were "thinly" capitalized, as they appear on the balance sheets to have a large amount of debt and small amount of equity. In Ms. Farr's opinion, the Portera Entities should be classified as equity rather than a liability because the debt appears to consist of undocumented shareholder loans. She converted the $1.6 million in shareholder's loans to capital contributions, changing Wife's interest from a negative to a positive. In Ms. Farr's view, Wife's interest in the Portera Entities appreciated in the amount of $444,000 from the date she was gifted the interest in 2014 until the December 2019 valuation. Ms. Farr accepted the original value of the 2014 gift to Wife as reported but did not recapitalize the shareholders' loans to capital in the 2014 values–only in her 2017 valuation. Her beginning values for 2014 were: BVAD, $45,600; RG, $3,800; PFLP, $64,168; and PFMLLC, $64,168. Ms. Farr agreed the 2017 tax return for BVAD shows a reduction of the loan during the tax year. She also acknowledged her conversion of the loans from Wife's father to equity automatically increased the value of the Wife's interest, but there was no corresponding money added into the company, nor were the loans removed as an asset from the other entities. Under Ms. Farr's theory, Wife's father would not receive repayment for the monies loaned if the two properties were sold. She agreed that Wife would hold a negative interest if she had not converted the shareholder loan to capital contributions.

On rebuttal, Mr. Steltzman questioned converting loans to equity for one entity but failing to make similar conversions for the other companies. He observed that Ms. Farr's method "attribut[ed] a marital asset to Ms. Niemeyer that she does not have." Mr. Steltzman asserted that "[T]he cash was used when [Wife's father] put it in and cash was used up when he was paid back in those instances. So the cash is probably not existent in the company anymore."

On July 28, 2022, the trial court addressed the classification and award of separate and marital property and found that the appreciation in value of Wife's interests in the Portera Entities should be given to Wife as her separate property. The court concluded that Husband's expert was more qualified and experienced concerning business valuations and accepted Ms. Farr's opinion of the appreciation in value of Wife's separate property in the amount of $444,000. The court acknowledged that the interest "is not itself readily liquid."

The court addressed Husband's claim that he provided a personal guaranty for a 1996 loan benefitting the 2014 gifted interest of Wife in the Portera Entities. Husband also asserted that he did not receive compensation for work completed for the Portera Entities in 2015 and 2016. Ms. Grafton, who is responsible for payroll in the accounting department at BVAD, maintained that Husband was paid for any work completed at BVAD and that he also received a tax document at the end of the year. Ms. Supan related that over 23 years, she observed Husband performing actual work at BVAD perhaps one or two times in 2015 or 2016.

The trial court determined as follows: "There was no evidence the Court recalls that the 1996 personal guaranty is now linked to the continued preservation and growth in value of the asset. These alleged contributions are too vague and speculative to deem them real and significant and directly linked to preservation and appreciation of the 2014-gifted asset of the Portera family business interest." As to Husband's work for the Portera Entities, the court found Wife's testimony credible that Husband was compensated:

> The Court credits Wife's testimony that Husband was compensated. Husband testified that in 2016 he contributed financially to the household. This evidence, however, is much different from evidence of a homemaker or family financial manager, providing real and significant contributions to the household over many years, consisting of innumerable intangible as well as tangible benefits over the years, directly linked to the preservation and appreciation over time of a separate asset. Although there was reference to financial contributions while Husband was out of state, it is hard to stretch an out of state homemaker on par with a homemaker as traditionally understood. For the foregoing reasons, the Court finds this asset, consisting of the base gift and its appreciation was not statutorily transmuted and, therefore, remains a separate asset.

- 8 -

On November 22, 2022, the final decree of divorce was approved, adopted, and incorporated the prior memorandum opinions upon the issues of Ali's severe disability, the classification and valuation of marital and separate property, the equitable division of marital property and liabilities, and the issues of child support and arrearages. The Pension was divided by the trial court 60% to Husband and 40% to Wife, commencing July 28, 2022. Husband was ordered to designate Wife as survivor beneficiary of no less than 40% of the Pension. The court further found that each party's portion of the Pension shall be included in their income for child support purposes retroactive to July 28, 2022. Wife was awarded $7,785.42 from Husband's TIAA-CREF plan and Husband was ordered to reimburse Wife $22,501 of the Smartbank Shortfall Loan.[3]

## II. ISSUES

The issues raised by Husband in this appeal are restated as follows:

1. Whether the trial court erred in finding that Ali is severely disabled and whether this finding created error in the court's child support calculation.

2. Whether the trial court erred in awarding Wife child support arrearage.

3. Whether the trial court erred in determining that Husband would have no visitation rights.

4. Whether the trial court erred in awarding Wife the entirety of the interest in appreciation of Wife's separate property.

## III. STANDARD OF REVIEW

Our review of the trial court's decision is de novo upon the record, and the trial court's factual findings are presumed correct, unless the preponderance of the evidence is otherwise. Tenn. R. App. P. 13(d); *Alexander v. Inman*, 974 S.W.2d 689, 692 (Tenn. 1998). The trial court's conclusions of law are subject to de novo review, with no presumption of correctness. *S. Constructors, Inc. v. Loudon Cnty. Bd. of Ed.*, 58 S.W.3d 706, 710 (Tenn. 2001); *Ganzevoort v. Russell*, 949 S.W.2d 293, 296 (Tenn. 1997).

"In all actions tried upon the facts without a jury, the court shall find the facts

---

[3] The parties purchased a condominium as an investment in 2006. They obtained a home equity line of credit on the property to pay credit card debt. When the condominium was sold in March of 2017, there was a deficiency of $61,000. Husband refused to accept responsibility for the deficiency and initially refused to come to closing on the sale until Wife secured a loan in her name to pay the debt. By January 14, 2020, she had paid $63,000 on the condominium loan at a rate of $1,935.34 per month.

specially and shall state separately its conclusions of law and direct the entry of the appropriate judgment." Tenn. R. Civ. P. 52.01. If the trial court makes the required findings of fact, appellate courts review the trial court's factual findings de novo upon the record, accompanied by a presumption of the correctness of the findings, unless the preponderance of the evidence is otherwise. *Kelly v. Kelly*, 445 S.W.3d 685, 692 (Tenn. 2014) (citing Tenn. R. App. P. 13(d)); *Armbrister v. Armbrister*, 414 S.W.3d 685, 692 (Tenn. 2013). "Appellate courts will not re-evaluate a trial judge's assessment of witness credibility absent clear and convincing evidence to the contrary." *Wells v. Tennessee Bd. of Regents*, 9 S.W.3d 779, 783 (Tenn. 1999).

## IV. DISCUSSION

## a. DISABILITY

The trial court found that Ali is severely disabled and was severely disabled prior to her turning 18 years of age. The court set Husband's obligation at $906 per month, beginning on October 1, 2022. Husband disputes the court's finding of a severe disability. In the alternative, he suggests a monthly obligation of $806.

According to Tennessee Code Annotated section 36-5-101(k),

(1) Except as provided in subdivision (k)(2), the court may continue child support beyond a child's minority for the benefit of a child who is handicapped or disabled, as defined by the Americans with Disabilities Act (42 U.S.C. § 12101 *et seq.*), until such child reaches twenty-one (21) years of age.

(2) Provided, that such age limitation shall not apply if such child is severely disabled and living under the care and supervision of a parent, and the court determines that it is in the child's best interest to remain under such care and supervision and that the obligor is financially able to continue to pay child support. In such cases, the court may require the obligor to continue to pay child support for such period as it deems in the best interest of the child; provided, however, that, if the severely disabled child living with a parent was disabled prior to this child attaining eighteen (18) years of age and if the child remains severely disabled at the time of entry of a final decree of divorce or legal separation, then the court may order child support regardless of the age of the child at the time of entry of the decree.

(3) In so doing, the court may use the child support guidelines.

(Emphasis added.).

- 10 -

At trial, Husband asserted that Wife did not request support for Ali, who was 23 years old at the time, in her original complaint. He notes that no claim pursuant to Tennessee Code Annotated section 36-5-101(k) was asserted and that the trial court did not have jurisdiction to consider such claims based upon the legal doctrine of estoppel and/or laches. Husband further argued that Wife's amended complaint did not include any allegation that Ali was disabled prior to attaining 18 years of age. He maintains that Wife has only changed her position for her pecuniary benefit. The attorney *ad litem* appointed for Ali argued that Ali is severely disabled within the meaning of Tennessee Code Annotated section 36-5-101(k)(2).

The trial court found Ali to be severely disabled pursuant to the applicable statute, finding the testimony of Ms. Supan and Ms. Grafton to be credible on the issue of "the child's ability to work, use transportation, and manage his or her financial affairs." The court cited Husband's testimony that he would be uncomfortable with Ali living on her own or crossing the street by herself. The court cited *Lillard v. Lillard*, No. M2019-02305-COA-R3-CV, 2021 WL 861769 (Tenn. Ct. App. Mar. 8, 2021), finding Ali's situation similar. The court likewise relied on the testimony of both parents and the uncontradicted corroboration of the other witnesses in finding that Ali's disability preceded her turning 18 years of age. Despite Husband complaining that Ali was not "afforded the opportunity to testify," we find the representation she received from the guardian *ad litem* and attorney *ad litem* protected her best interest. A preponderance of the evidence of record supports the finding that the trial court did not err in finding that Ali is severely disabled.

Likewise, we hold that the trial court did not abuse its discretion in setting the monthly support obligation. As noted in *Lillard*, 2021 WL 861769, at n.3, the trial court was not required to use the child support guidelines in a section 36-5-101(k) matter. Tenn. Code Ann. § 36-5-101(k)(3). The trial court's determination was reasonable.

### b. CHILD SUPPORT/ARREARAGES

We review child support decisions based upon the deferential "abuse of discretion" standard. *Richardson v. Spanos*, 189 S.W. 3d 720, 725 (Tenn. Ct. App. 2005). The abuse of discretion standard of review does not permit a reviewing court to substitute its discretion for that of the trial court. *Lee Med., Inc. v. Beecher*, 312 S.W.3d 515, 524 (Tenn. 2010). A court abuses its discretion when it causes an injustice by applying an incorrect legal standard, reaching an illogical decision, or by resolving the case "on a clearly erroneous assessment of the evidence." *Henderson v. SAIA, Inc.*, 318 S.W.3d 328, 335 (Tenn. 2010) (citing *Lee Med., Inc.*, 312 S.W.3d at 524).

On March 14, 2022, the court found Wife's yearly income to be $88,269.48 and Husband's yearly income to be $77,058. Dividing these amounts by 12, Wife's monthly gross income was found to be $7,355.79 and Husband's $6,421.50. The court directed that

these amounts be utilized to prepare the child support worksheets.

In the final decree, the court found that Wife was entitled to a judgment against Husband for child support arrearages and children's expenses through May 2022 in the amount of $37,441.54. The child support obligation for Scout and Ali was set at $1,084 per month from June 1, 2022, through July 28, 2022. Commencing July 28, 2022, until Scout reached age 18 on September 30, 2022, Husband's child support obligation for both daughters was $1,175 per month. The court declined an upward deviation based upon Scout's tuition expenses for GPS. From October 1, 2022 going forward, the support obligation for Ali was $906 per month.

Neither party was completely satisfied with the trial court's rulings as to support and arrearages. Actual income amounts for both parties are uncertain. Wife argues that the trial court abused its discretion in failing to include the Pension in Husband's pre-decree income for determining the correct amount of child support pursuant to the child support guidelines. Husband began to receive the Pension in the gross amount of $2,089.50 per month in October 2020, and received it continuously until the court made a division of the Pension on July 28, 2022. After the filing of the divorce, Husband had little if any contact with his daughters and paid child support below guideline levels for two years. There is no evidence in the record that Wife received any portion of the Pension. Evidence reveals that Husband resisted dividing the Pension during the pendency of the action. Also asserting error by the court, Husband claims the division of the Pension in the final decree should be used to satisfy his child support obligation for Ali; he demands a credit against child support for the portion of the Pension awarded to Wife. Husband argues "the beneficiary designation is intended to constitute support for Ali," and he seeks credit for what Wife receives monthly as marital property ($839.43) toward his child support obligation ($906).

Upon review of the record in its entirety, we cannot find any abuse of discretion that would permit us to find error in the trial court's ruling. "[A] trial court's discretionary decision will be upheld as long as it is not clearly unreasonable, *Bogan v. Bogan*, 60 S.W.3d 721, 733 (Tenn. 2001), and reasonable minds can disagree about its correctness." *Richardson*, 189 S.W.3d at 725 (citing *Eldridge v. Eldridge*, 42 S.W.3d 82, 85 (Tenn. 2001)). We defer to the trial court's findings.

### c. VISITATION AND PARENTING

Husband asserted in this appeal that Wife had alienated the children from him during the pendency of the divorce case. He claimed that he was "improperly, unlawfully, and wrongfully deprived of his residential time," especially when he was a caregiver for Ali and Scout and "was the primary caregiver during a portion of 2016 through November of 2017."

Wife testified regarding the time period when she did not live with the children from late 2016 through November 2017. She related that Husband's "anger just escalated" when he did not get a new job outside of Chattanooga as soon as he hoped. She stayed with her parents during this time because she believed her presence triggered his rage. She believed that she "couldn't remove Ali because of her routine" and she "was only a few hundred yards away." Wife observed that she was not out of the apartment except for in the evening. She returned at 6 a.m. to get Ali and Scout up and to take Scout to school. She would "keep them out for dinner, and then … take them back … when it was time for bed." As to weekends during this time period, Wife observed that she took her daughters to church and to dinner after services. On Sundays, Husband drove to Maryville to see his father and mow the lawn there. He did not take Ali and Scout with him on these trips.

Before the trial court applied the "best interest" factors found at Tennessee Code Annotated section 36-6-106(a), it considered whether a limitation was applicable as set out in Tennessee Code Annotated section 36-6-406(a)–(d). In the court's March 14, 2022, Memorandum Opinion, it determined that Husband had engaged in physical abuse of a child and a pattern of emotional abuse of Wife pursuant to Tennessee Code Annotated section 36-6-406(a)(2). That finding was supported by the testimony of Wife, her sister, her employees, Scout, Scout's therapist, and even Husband. The court took notice of the one-year OP entered on November 13, 2017, Husband's threats of physical violence against Wife and her family, and a physical altercation with Ali. In particular, the trial court found Ms. Supan's testimony to be credible and "disturbing." The court further observed that Husband's anger issues were "exceedingly evident" in his courtroom demeanor, finding that he had issues managing his anger in court, with angry outbursts directed at both counsel and the court. Husband admitted his volatility.

The court carefully weighed the statutory factors in Tennessee Code Annotated section 36-6-106(a)(1)–(15), enumerating, discussing, and making findings of facts on each section of the statute. Husband cites no portion of the record or transcript that does not support the trial court's findings of fact. He overlooks the fact that agreed orders limiting his contact with the children and his failure to follow through on orders and agreements to attend counseling are the reason he did not see Ali and Scout. Husband offers no support of his allegations that he was denied hearings or his parental rights were terminated. Husband's counsel provided tenacious representation throughout the case but provided no proof of parental alienation.

In the order issued just months before Scout turned 18, the court held that the evidence belied Husband's claim that he had a close relationship with his youngest daughter. Her relationship was substantially greater with Wife than with Husband. Additionally, Husband has yelled loudly and physically abused Ali. There is a substantial amount of conflict between Husband and the family members. The court observed that Wife has clearly performed the majority of the parental duties and been the primary caregiver. Scout has a severed relationship with Husband and does not demonstrate the

- 13 -

need for a close relationship with her father. The trial court correctly designated Wife as the primary residential parent for Scout. Based on its review of the pertinent statutory factors, the trial court properly implemented a parenting plan consistent with the best interests of the youngest child.

We further note that the parenting issues are now moot, as both children are over the age of majority. "To be justiciable, an issue must be cognizable not only at the inception of the litigation but also throughout its pendency." *Norma Faye Pyles Lynch Family Purpose LLC*, 301 S.W.3d 196, 203–04 (Tenn. 2009). An issue becomes moot if an event occurring after the commencement of the case extinguishes the legal controversy attached to the issue, *Lufkin v. Bd. of Prof'l Responsibility*, 336 S.W.3d 223, 226 (Tenn. 2011), or otherwise prevents the prevailing party from receiving meaningful relief in the event of a favorable judgment, *see Knott v. Stewart Cnty.*, 207 S.W.2d 337, 338–39 (Tenn. 1948).

### d. VALUATION OF WIFE'S SEPARATE PROPERTY

Wife submits that her interests in the Portera Entities are her separate property and any appreciation in value of those interests from the date of the transfer from her parents is her separate property. Husband submits that the appreciation is marital property.

Husband claims that he provided a personal guaranty for a business loan benefitting the 2014 gifted interest. When asked about a business loan co-signed by Husband, Wife responded that although he did sign the loan in the 1990s, no marital funds were used to repay the loan, and she had no ownership interest in the Portera Entities until 2014. The trial court found no evidence that this loan benefitted the gifted interest 18 years after the fact. Husband also alleged that he worked for BVAD "without pay throughout 2015 and 2016 when he maintained a separate/second job." He failed, however, to put a value on what he claims he significantly contributed between 2014 and 2017 which gave rise to the alleged increase in value of Wife's separate property. His expert, Ms. Farr, gave no testimony that any actions of Husband contributed to the alleged increase in value. Moreover, the testimony of Wife and other witnesses supports the determination that Husband contributed very little during the relevant time period claimed.

The division of a marital estate necessarily begins with the classification of the parties' property as either marital or separate property. *McClellan v. McClellan*, 873 S.W.2d 350, 351 (Tenn. Ct. App. 1993); *Batson v. Batson*, 769 S.W.2d 849, 856 (Tenn. Ct. App. 1988). It is the burden of the spouse who seeks to show that the asset has transmuted from separate to marital property as defined in Tennessee Code Annotated section 36-4-121(b)(1). *McCartney v. McCartney*, No. M2020-00703-COA-R3-CV, 2021 WL 3578978 (Tenn. Ct. App. Aug. 13, 2021).

"Separate property" includes "all real and personal property owned by a spouse

- 14 -

before marriage," Tenn. Code Ann. § 36-4-121(b)(2)(A), and "property acquired by a spouse at any time by gift, bequest, devise or descent." Tenn. Code Ann. § 36-4-121(b)(2)(D). "Marital property" includes "all real and personal property ... acquired by either or both spouses during the course of the marriage ... ," and "income from, and any increase in value during the marriage, of property determined to be separate property … if each party substantially contributed to its preservation and appreciation ...." Tenn. Code Ann. § 36-4-121(b)(1)(A), (B). Tennessee Code Annotated section 36-4-121 provides that "direct" and "indirect" "substantial contribution" to the appreciation of separately held property will render the increase marital property under the statute.

In order to be substantial, contributions, either direct or indirect, must satisfy two requirements. First, the contributions, must be "real and significant" but need not be "monetarily commensurate to the appreciation in the separate property's value, nor must they relate directly to the separate property at issue." *Brown v. Brown*, 913 S.W.2d 163, 167 (Tenn. Ct. App. 1994). "Second, there must be some link between the spouses' contributions and the appreciation in the value of the separate property." *Id.*

The trial court properly determined that the gifted stock in the Portera Entities is Wife's separate property, not marital property. The court appropriately exercised its discretion in finding that no substantial contribution had been made by Husband to the appreciation in value as found by Husband's expert. The court concluded that the appreciated value had not been transmuted and is not subject to distribution by the trial court. The court did, however, accept Husband's expert's opinion that the interest had increased in value $444,000 in three years. Wife disputes that her gifted separate property increased $444,000 from 2014, the date of the gift, to 2017. She claims the recharacterized loan results in non-existent money as her appreciation.

Again, after our review, we cannot identify any error in the actions of the trial court in this matter. Under the facts before us, the trial court did not abuse its discretion in finding the testimony of Husband's expert more relevant than Wife's expert to its determination of the value of Wife's separate property.

### e. WIFE'S ATTORNEY FEES ON APPEAL

Wife requests that this court award her attorney fees incurred on appeal. In Tennessee, "litigants are responsible for their own attorney's fees absent a statute or agreement between the parties providing otherwise." *Darvarmanesh v. Gharacholou*, No. M2004-00262-COA-R3-CV, 2005 WL 1684050, at \*16 (Tenn. Ct. App. July 19, 2005) (citing *State v. Brown & Williamson Tobacco Corp.*, 18 S.W.3d 186, 194 (Tenn. 2000)). However, Tennessee Code Annotated section 36-5-103(c) allows a court, in its discretion, to award attorney fees in a proceeding such as this (custody and support); *see also Archer v. Archer*, 907 S.W.2d 412, 419 (Tenn. Ct. App. 1995). This court has discretion to award Wife appellate attorney fees under the foregoing statute. "In considering a request for

attorney's fees on appeal, we consider the requesting party's ability to pay such fees, the requesting party's success on appeal, whether the appeal was taken in good faith, and any other equitable factors relevant in a given case." *In re C.W.*, 420 S.W.3d 13, 22 (Tenn. Ct. App. 2013) (citing *Darvarmanesh*, 2005 WL 1684050, at *16). Because we have affirmed the trial court's judgment in favor of Wife on all issues raised, Wife is the prevailing party. We find that Husband's actions resulted in extensive and lengthy litigation, taken in bad faith and for purposes of delay. Further, Husband has raised moot issues regarding Scout, now an adult, and his argument concerning Ali has no basis in fact. We conclude that Wife is entitled to an award of attorney fees on appeal. As such, we grant Wife's request for appellate attorney fees.

## V. CONCLUSION

The judgment of the trial court is affirmed in all respects, and this matter is remanded for determination of Wife's reasonable appellate attorney fees and costs and for such further proceedings as may be necessary and consistent with this opinion. Costs of the appeal are assessed against the appellant, Glenn Paul Niemeyer.

_____
JOHN W. MCCLARTY, JUDGE